251 P.3d 884 (2010)
160 Wash.App. 479
In the Matter of the Personal Restraint Petition of Kurtis William MONSCHKE, Petitioner.
No. 38365-9-II.
Court of Appeals of Washington, Division 2.
December 21, 2010.
Publication Ordered March 9, 2011.
*886 Eric J. Nielsen, David Bruce Koch, Nielsen Broman & Koch PLLC, Seattle, WA, Kurtis Monschke, (Appearing Pro Se), Inez, KY, for Petitioner.
Kathleen Proctor, Pierce County Prosecuting Attorney Office, Tacoma, WA, for Respondent.
VAN DEREN, J.
¶ 1 In this personal restraint petition (PRP), Kurtis William Monschke asks us to order a new trial or a reference hearing regarding his conviction for aggravated first degree murder. He argues that (1) his trial counsel were ineffective when they did not do *887 a proper investigation or pretrial preparation of his defense expert witness who, in testifying, undermined key elements of Monschke's defense and (2) it was prosecutorial misconduct for the State to reach a plea agreement with Monschke's codefendant Tristain Frye based on a personal friendship between the elected prosecutor and Frye's defense attorney and to allow Frye to testify against him, knowing that she would commit perjury. We deny Monschke's personal restraint petition.

FACTS[1]
¶ 2 On March 23, 2003, Kurtis Monschke; Tristain Frye Scotty Butters; and David Pillatos assaulted Randall Townsend, a homeless man who lived under the interstate near the Tacoma Dome. State v. Monschke, 133 Wash.App. 313, 318-20, 135 P.3d 966 (2006). After 20 days on life support, Townsend died. Monschke, 133 Wash.App. at 320, 135 P.3d 966. The State charged Monschke, Frye, Butters, and Pillatos with aggravated first degree murder under RCW 9A.32.030 and RCW 10.95.020(6). Monschke, 133 Wash. App. at 321, 135 P.3d 966. The State alleged as an aggravating circumstance that "Townsend was murdered so that the defendants could obtain or maintain their membership or advance their position in the hierarchy of an organization or identifiable group, namely, `white supremacists.'" Monschke, 133 Wash. App. at 321, 135 P.3d 966 (quoting 1 Clerk's Papers at 84).
¶ 3 Monschke and his codefendants were held at the Pierce County Jail, where it was jail procedure to open and screen inmate mail for contraband and other illegal activity. During this routine screening, jail staff discovered that Monschke had received a letter from a white supremacist group. The jail sent a copy of the letter to the Pierce County prosecutor's office. The State then requested that the jail photocopy all incoming and outgoing mail belonging to the four defendants, with the exception of legal mail. The State distributed copies of the defendants' mail to defense counsel so that all parties had copies of the inmate mail before trial. Through this process, the State discovered that Frye and Pillatos were violating a no-contact order by sending mail to each other through a third party. In these letters, Frye expressed a desire for guidance from Pillatos on how to proceed ("I need to know what [Pillatos] wants me to do." Br. of Resp't, App. S at 1721) and Pillatos attempted to persuade Frye to testify against him, but to make sure to emphasize that he did not seem like himself in order to help with his insanity defense.
¶ 4 Before trial, Monschke's three codefendants entered into plea agreements with the State. Monschke, 133 Wash.App. at 321, 135 P.3d 966. Frye agreed to plead guilty to second degree murder. Monschke, 133 Wash.App. at 321, 135 P.3d 966. Her plea agreement was conditioned on her being truthful and honest with prosecutors at all times and that she "testify truthfully and fully at the trial or trials" of her codefendant(s). Br. of Resp't, App. E at 2. The State filed a statement that explained its reasons for amending Frye's information to allege lesser charges, including:
(1) her reluctance to participate in the crime; (2) the substantially lower level of her culpability in committing the crime as compared to her codefendants; (3) the difference in the amount of physical harm she inflicted on Mr. Townsend as compared to her codefendants; (4) her remorse and horror expressed from shortly after the murder was committed to present; and[] (5) her willingness to take responsibility for her actions and to cooperate in the prosecution of her codefendants.
Br. of Resp't, App. G at 2.
¶ 5 Pillatos and Butters pleaded guilty to first degree murder. Monschke, 133 Wash. App. at 321, 135 P.3d 966. Monschke refused the offer Pillatos and Butters accepted and, thus, was the only one of the four defendants to go to trial. All four testified at Monschke's trial.
¶ 6 Frye testified that on March 22, 2003, Pillatos wanted to take her, his fiancée, out *888 to earn her red shoelaces,[2] which she could do by assaulting a member of a minority group. Monschke, 133 Wash.App. at 323, 135 P.3d 966. Monschke, Pillatos, and Butters already wore red laces. Monschke, 133 Wash.App. at 323, 135 P.3d 966. After discussing the idea with Butters and Monschke, the four drove to the store where they purchased beer and two baseball bats. Monschke, 133 Wash.App. at 323, 135 P.3d 966. The four did not discuss the reason for purchasing the bats but, according to Frye, it was understood that "`they weren't going to be used for baseball.'" Monschke, 133 Wash. App. at 323, 135 P.3d 966 (quoting 31 Report of Proceedings (RP) at 2485).
¶ 7 They parked near the Tacoma Dome and walked under Interstate 705 so Frye and Pillatos could show Monschke graffiti that they had painted under the overpass.[3]Monschke, 133 Wash.App. at 323, 135 P.3d 966. According to Frye, she separated from the group and began talking to Townsend. Monschke, 133 Wash.App. at 323, 135 P.3d 966. Butters and Pillatos came over to where Frye and Townsend were talking. Butters hit Townsend over the head with one of the baseball bats causing him to fall to the ground. Monschke, 133 Wash.App. at 323, 135 P.3d 966. Butters and Pillatos began kicking Townsend in the head and Pillatos threw a 38 pound rock on Townsend's face. Monschke, 133 Wash.App. at 323, 135 P.3d 966. Butters and Pillatos then carried Townsend to the railroad tracks and performed a "curb stomp" by stomping on the back of Townsend's head while he lay face down on the track. Monschke, 133 Wash.App. at 323, 135 P.3d 966.
¶ 8 Butters and Pillatos then left to find Monschke. When they returned with Monschke to where Townsend lay, Monschke began hitting him in the head with the other bat. Monschke, 133 Wash.App. at 324, 135 P.3d 966. According to Frye, Monschke hit Townsend 10 to 15 times.[4]Monschke, 133 Wash.App. at 324, 135 P.3d 966. "Pillatos told Frye to kick Townsend," which "she initially refused[,] but Pillatos covered her eyes and led her to Townsend" where she kicked his head 4 times. Monschke, 133 Wash.App. at 324, 135 P.3d 966. "As the group left, Monschke stated, `I wonder if God gives us little brownie points for this.'" Monschke, 133 Wash.App. at 324, 135 P.3d 966 (quoting 31 RP at 2374). Butters told Frye "that she had earned her red laces and he had earned his `bolts.'"[5]Monschke, 133 Wash.App. at 324, 135 P.3d 966 (quoting 31 RP at 2375). Pillatos testified that Townsend "got beat up" because he was a drug addict and a "parasite." Monschke, 133 Wash.App. at 325, 135 P.3d 966.
¶ 9 As discussed in the published portion of our opinion from Monschke's direct appeal, both parties presented expert testimony on white supremacists at trial:
The State called Mark Pitcavage, the director of fact-finding for the Anti-Defamation League (ADL). Pitcavage had studied white supremacy for several years and supervised the ADL's monitoring and research of extremist groups. Pitcavage testified that white supremacists could be identified by a shared ideology summed up in the following mission statement known as "The 14 Words": "We must secure the existence of our race and a future for white children." Pitcavage opined that this ideology *889 fostered so many shared similarities, beliefs, and customs that white supremacists could be considered a "group" within the common meaning of the term.
Pitcavage considered white supremacists to be a "group" even though they were not well organized, did not have one overarching structure, had many subgroups, and were split over the advocacy and use of violence. Pitcavage explained that the subgroups were nonexclusive; routinely overlapping; and often loosely organized to prevent police infiltration, to limit legal liability, and to maintain a certain level of personal anonymity. Pitcavage testified to an organized "hierarchal structure" "in terms of status, where someone who's perceived to be really standing up for the white race, really being a white warrior, gets more result of status, gets more respect." In addition, Pitcavage testified that many subgroups internally advocated violence but publicly professed nonviolence so as to avoid lawsuits of the sort that had disbanded earlier white supremacy groups.
Monschke called Randy Blazak, a college professor whose research focused on hate crimes. Blazak opined that white supremacists were not an "identifiable group." Blazak agreed with Pitcavage that white supremacists shared an ideology captured by "The 14 Words," but he testified that, in his opinion there was too much conflict within the movement to consider white supremacists a cohesive group. These conflicts included disagreement over the need of an organized hierarchy, the use of violence, the role of religion, and defining who was "white."
Blazak also testified about Volksfront and National Alliance. According to Blazak, National Alliance was a highly violent subgroup of white supremacists. Blazak testified that a member could gain status in National Alliance for murdering someone deemed inferior. Blazak described Volksfront as a very secretive organization with a "public front" of nonviolence, but he noted that "there may be other things that go on behind closed doors." Blazak also testified that Volksfront had an organizational hierarchy. According to Blazak, Volksfront and National Alliance had, over the last several years, been partnering and connecting.
The State presented evidence that Volksfront maintained a prisoners of war (POW) list on its website. The list included the contact information for members of the white supremacy movement that had committed hate crimes and were currently incarcerated. Several individuals on the list had committed "very violent" crimes. The State also presented evidence that Monschke left messages on Volksfront's website and that he went by the screen name "SHARPshooter."
Monschke, 133 Wash.App. at 326-28, 135 P.3d 966 (citations omitted).
¶ 10 The jury convicted Monschke of aggravated first degree murder. Monschke, 133 Wash.App. at 318, 135 P.3d 966. He was sentenced to life without possibility of parole. Monschke appealed, challenging "the constitutionality of RCW 10.95.020(6), the sufficiency of the evidence, the trial court's refusal to bifurcate the trial, and the court's order requiring him to wear a stun belt at trial." Monschke, 133 Wash.App. at 318-19, 135 P.3d 966. We affirmed his conviction.[6] *890 Monschke, 133 Wash.App. at 319, 135 P.3d 966. The United States Supreme Court denied Monschke's petition for certiorari. Monschke v. Washington, 552 U.S. 841, 128 S.Ct. 83, 169 L.Ed.2d 64 (2007). Monschke timely filed this PRP.

ANALYSIS

I. Personal Restraint Petition Standard of Review
¶ 11 A petitioner may request relief through a PRP when he is under an unlawful restraint.[7] RAP 16.4(a)-(c). Our Supreme Court has limited collateral relief available through a PRP "`because it undermines the principles of finality of litigation, degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders.'" In re Pers. Restraint of Davis, 152 Wash.2d 647, 670, 101 P.3d 1 (2004) (quoting In re Pers. Restraint of St. Pierre, 118 Wash.2d 321, 329, 823 P.2d 492 (1992)). A personal restraint petitioner must prove either a(1) constitutional error that results in actual and substantial prejudice or (2) nonconstitutional error that "constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" Davis, 152 Wash.2d at 672, 101 P.3d 1 (quoting In re Pers. Restraint of Cook, 114 Wash.2d 802, 813, 792 P.2d 506 (1990)). Additionally, the petitioner must prove the error by a preponderance of the evidence. In re Pers. Restraint of Lord, 152 Wash.2d 182, 188, 94 P.3d 952 (2004).
¶ 12 The petitioner must support the petition with facts or evidence and may not rely solely on conclusory allegations. RAP 16.7(a)(2)(i); Cook, 114 Wash.2d at 813-14, 792 P.2d 506; In re Pers. Restraint of Williams, 111 Wash.2d 353, 365, 759 P.2d 436 (1988). For allegations "based on matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief." In re Pers. Restraint of Rice, 118 Wash.2d 876, 886, 828 P.2d 1086 (1992). "If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence. The affidavits . . . must contain matters to which the affiants may competently testify." Rice, 118 Wash.2d at 886, 828 P.2d 1086. The petitioner must show that the "factual allegations are based on more than speculation, conjecture, or inadmissible hearsay." Rice, 118 Wash.2d at 886, 828 P.2d 1086.
¶ 13 "Once the petitioner makes this threshold showing, the court will then examine the State's response," which must "answer the allegations of the petition and identify all material disputed questions of fact." Rice, 118 Wash.2d at 886, 828 P.2d 1086. "[T]o define disputed questions of fact, the State must meet the petitioner's evidence with its own competent evidence" and only after "the parties' materials establish the existence of material disputed issues of fact" will we direct the trial court "to hold a reference hearing in order to resolve the factual questions." Rice, 118 Wash.2d at 886-87, 828 P.2d 1086.
¶ 14 Thus, when reviewing a PRP, we have three options:
1. If a petitioner fails to meet the threshold burden of showing actual prejudice arising from constitutional error, the petition must be dismissed;[[8]]
If a petitioner makes at least a prima facie showing of actual prejudice, but the merits of the contentions cannot be determined solely on the record, the court should remand the petition for a full hearing on the merits or for a reference hearing pursuant to RAP 16.11(a) and RAP 16.12; [or]

*891 If the court is convinced a petitioner has proven actual prejudicial error, the court should grant the P[RP] without remanding the cause for further hearing.
In re Pers. Restraint of Hews, 99 Wash.2d 80, 88, 660 P.2d 263 (1983).

II. Ineffective Assistance of Counsel
¶ 15 Monschke first argues that his trial counsel was ineffective for failing to adequately interview and prepare his defense expert, Dr. Randy Blazak, before trial. The State responds that Monschke is merely second guessing his attorneys' decision to call an expert witness because there is no evidence of lack of trial preparation or investigation, especially in that Monschke's trial counsel consulted the expert witness more than once before trial.

A. Standard of Review
¶ 16 We review claims of ineffective assistance of counsel de novo. State v. Cross, 156 Wash.2d 580, 605, 132 P.3d 80 (2006). To prove ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient, i.e., that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced him, i.e., that there is a reasonable possibility that, but for the deficient conduct, the outcome of the proceeding would have differed. State v. Thomas, 109 Wash.2d 222, 225-26, 743 P.2d 816 (1987). This standard is "highly deferential and courts will indulge in a strong presumption of reasonableness" until the defendant shows in the record the absence of legitimate or tactical reasons supporting trial counsel's conduct. Thomas, 109 Wash.2d at 226, 743 P.2d 816. But "[t]his presumption can be overcome by showing, among other things, that counsel failed to conduct appropriate investigations, either factual or legal, to determine what matters of defense were available, or failed to allow himself enough time for reflection and preparation for trial." State v. Jury, 19 Wash.App. 256, 263, 576 P.2d 1302 (1978).
¶ 17 At oral argument and in its statement of additional authority, the State contended that, because this is a PRP, Monschke must show prejudice beyond "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" as Strickland requires. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Generally, in a PRP, the petitioner must demonstrate by a preponderance of the evidence that a constitutional error resulted in actual and substantial prejudice or a nonconstitutional error resulted in a complete miscarriage of justice. Davis, 152 Wash.2d at 672, 101 P.3d 1. But, as we held in In re Pers. Restraint of Crace, a personal restraint petitioner need not "satisfy a heightened prejudice requirement under actual and substantial prejudice that exceeds the showing of prejudice necessary to successfully establish the Strickland prejudice prong" when the PRP is based on ineffective assistance of counsel. 157 Wash.App. 81, 112-14, 236 P.3d 914 (2010), petition for review filed, No. 85131-0 (Wash. Oct. 1, 2010).
¶ 18 Moreover, "[i]n Davis, our Supreme Court . . . equated the Strickland prejudice standard with actual and substantial prejudice," holding that "`Davis cannot establish actual and substantial prejudice. . . . Because there was overwhelming evidence of his guilt, he cannot show there was a reasonable probability that, but for his counsel's deficient performance by not objecting, the outcome of his trial would have been different.'" Crace, 157 Wash.App. at 111 n. 16, 236 P.3d 914 (second alteration in original) (quoting Davis, 152 Wash.2d at 700, 101 P.3d 1). Thus, a petitioner need not establish prejudice beyond that required by Strickland to satisfy "actual and substantial prejudice" in a PRP.[9]
*892 ¶ 19 Additionally, the State's statement of additional authority "on whether a petitioner in a collateral attack must make a higher showing of prejudice on an ineffective assistance of counsel claim than a defendant on direct appeal" cites Rice, 118 Wash.2d at 889, 828 P.2d 1086, as "describing [the] St[r]ickland test as a prima facie showing that might entitle a petitioner in a collateral attack to an evidentiary hearing." Resp't's Statement of Additional Authority at 1-2 (emphasis omitted). But our examination of our Supreme Court's response to Rice's ineffective assistance of counsel claim shows that the court applied the Strickland standard; thus, Rice does not support the State's argument that a heightened showing of prejudice is necessary in the PRP context. 118 Wash.2d at 888-89, 828 P.2d 1086 ("No evidentiary hearing is required in a collateral proceeding if the defendant fails to allege facts establishing the kind of prejudice necessary to satisfy the Strickland test."). Accordingly, we again hold that a petitioner need not satisfy a "heightened prejudice requirement under actual and substantial prejudice that exceeds the showing of prejudice necessary to successfully establish the Strickland prejudice prong" in the ineffective assistance of counsel context. Crace, 157 Wash.App. at 112, 236 P.3d 914.

B. Expert Witness Testimony
¶ 20 Generally, an attorney's decision to call a witness to testify is "a matter of legitimate trial tactics," which "will not support a claim of ineffective assistance of counsel." State v. Byrd, 30 Wash.App. 794, 799, 638 P.2d 601 (1981). But a petitioner can overcome this presumption by demonstrating that counsel failed to adequately investigate or prepare for trial. Byrd, 30 Wash.App. at 799, 638 P.2d 601.
¶ 21 To support his claim of ineffective assistance of counsel, Monschke submitted declarations from Blazak and Erik Bauer, one of his two defense counsel. Blazak's declaration states that (1) before he testified, he spoke to Monschke's counsel by phone and in person; (2) nothing he testified to was inconsistent with what he told defense counsel in pretrial preparations; (3) he was not asked to prepare a report of his proposed testimony before trial; and (4) Monschke's counsel did not engage Blazak in a mock trial exercise to prepare for direct and cross-examination.
¶ 22 Monschke's trial attorneys made a strategic and tactical decision to call an expert witness to explain that white supremacists are not an identifiable group and that Volksfront was a nonviolent white supremacist group. Thus, Monschke's attorneys planned to "negate[] the prosecution's efforts to establish Mr. Monschke's membership and advancement as required by the [aggravating circumstance] statute." PRP Decl. of Eric L. Bauer (Dec. of Bauer) at 2-3. But, according to defense counsel, at trial, Blazak "presented opinions that he had not presented in pretrial interviews" and he "volunteered [the damaging information] without being prompted." Dec. of Bauer at 3. Even though this unexpected testimony allegedly *893 "damaged the defense on every critical point," Monschke's counsel's performance does not rise to the level of ineffective assistance of counsel. Dec. of Bauer at 3.
¶ 23 In In re Personal Restraint of Pirtle, 136 Wash.2d 467, 488, 965 P.2d 593 (1998), our Supreme Court held that "there is no absolute requirement that defense counsel interview witnesses before trial" and ruled that trial counsel was not ineffective for failing to conduct pretrial interviews of the witnesses. The court noted that, although Pirtle's counsel did not conduct formal witness interviews, "counsel spent considerable time reviewing evidence and obtaining answers to various questions" with detectives and Pirtle failed to show how his counsel's approach was inadequate. Pirtle, 136 Wash.2d at 488, 965 P.2d 593. Our Supreme Court reiterated this proposition in In re Pers. Restraint of Stenson, 142 Wash.2d 710, 754-57, 16 P.3d 1 (2001).
¶ 24 In Stenson, the court declined to hold the petitioner's trial counsel ineffective for not personally interviewing Dr. Brady, the medical examiner, before trial but, instead, relied on his investigator's pretrial interview of the witness. 142 Wash.2d at 754, 16 P.3d 1. Similar to what Monschke points to here, at Stenson's trial, Dr. Brady offered unexpected, damaging testimony. In Stenson, the court stated that Stenson's attorney's "cross-examination of Brady did not go well because Brady was a difficult witness, not because of deficient preparation." Stenson, 142 Wash.2d at 755, 16 P.3d 1. Bauer declares that Blazak volunteered information without prompting by questions during his testimony. In any attorney's experience, this behavior by a witness is problematic, making the person a difficult witness. But Monschke points to nothing that would have ensured that Blazak did not volunteer information on the stand, even if his counsel had done a mock trial or practiced Blazak's testimony, since Blazak volunteered his testimony without prompting, and Blazak declared he testified to nothing inconsistent with what he told Monschke's defense counsel before trial.
¶ 25 Monschke does not argue that defense counsel is held to a higher standard in preparing for an expert witness than the standard applicable to an alibi witness or any other indispensable witness. The record does not disclose the details of Monschke's trial counsel's pretrial interviews with Blazak, but we do know that they met with him more than once. From the record before us, Monschke's trial counsel's preparation of Blazak did not fall below the standard discussed in Stenson or Pirtle. Therefore, we hold that, because Monschke's counsel made a strategic tactical decision to call an expert to rebut the State's expert testimony, met with Blazak before trial, and then Blazak volunteered information from the witness stand, Monschke has not met his burden of establishing that trial counsel's performance was deficient based on inadequate expert witness preparation.
¶ 26 Additionally, Monschke has failed to meet his burden to show that Blazak's unexpected testimony prejudiced him. Monschke must show that there is a reasonable probability that, but for an error by his attorney, the result of the proceeding would have differed. See Strickland, 466 U.S. at 695, 104 S.Ct. 2052. First, Blazak provided both expected testimony that helped the defense as well as, unexpected, damaging testimony. Throughout his testimony, Blazak remained consistent in putting forth his views that supported Monschke's position that "white supremac[ists]" were not an "identifiable group" because there is too much disagreement among the people who share the white supremacist ideology. 34 RP at 2891. Blazak also testified that Volksfront has a hierarchy in which members "gain status . . . through hard work and dedication." 34 RP at 2920.
¶ 27 Additionally, he explained how a person might obtain notoriety among people who are white supremacists by murdering someone inferior, but he maintained that white supremac[ists] do not have a formal hierarchy or status structure. Blazak further testified that Volksfront may secretly promote violence, but he also stated that, "having monitored [Volksfront,] we couldn't come up with any incidents of anybody who has been promoted because of any act of violence." 34 RP at 2914. Blazak also testified that Volksfront e-mailed Blazak, saying that they "condemn *894 acts of violence and [Monschke's] membership . . . had been terminated," that "the movement of Volksfront is to say these violent offenders are hurting [their] larger cause," that "newer members of the Volksfront are less violent," and that he believes Randall Craiger, the leader of Volksfront, "is sincere in his desire to take Volksfront into this new [nonviolent] territory of white supremacy." 34 RP at 2914, 2964, 2970, 2972.
¶ 28 It is unclear whether Monschke is arguing that his trial attorneys should have called another expert or no expert at all. But even without Blazak's testimony, there was sufficient evidence for a reasonable jury to have found the aggravating circumstance based on other trial testimony. For example, the State's expert witness testified that many white supremacist groups internally advocate violence but publicly profess nonviolence to avoid civil liability. Monschke, 133 Wash.App. at 327, 135 P.3d 966. Thus, the State had already offered testimony similar to Blazak's. Additionally, Monschke admitted his involvement in Volksfront. Frye's testimony about going out with Monschke, Butters, and Pillatos to earn her red shoelaces, which would mean increased notoriety among white supremacists, also supports the aggravating circumstance.
¶ 29 Because we hold that Monschke's counsel was not deficient and did not prejudice Monshke's right to a fair trial, his ineffective assistance of counsel claim fails.

III. Prosecutorial Misconduct
¶ 30 Monschke also argues that the prosecutor committed misconduct by having Frye testify at Monschke's trial, "knowing [she and Pillatos] had concocted a false story." Br. of Pet'r at 34 (emphasis omitted). The State responds that the prosecutor did not "offer a plea agreement to Ms. Frye . . . for any improper purpose" and that Ms. Frye did not commit perjury, or, if she did, the prosecution did not know about it. Br. of Resp't at 18.

A. Standard of Review
¶ 31 To prevail on a prosecutorial misconduct claim, a petitioner "`must establish both improper conduct by the prosecutor and prejudicial effect.'" Pirtle, 136 Wash.2d at 481-82, 965 P.2d 593 (quoting State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995)). To establish prejudice, the petitioner must show a substantial likelihood that the misconduct affected the jury's verdict. Pirtle, 136 Wash.2d at 481-82, 965 P.2d 593. Additionally, the petitioner must show actual and substantial prejudice arising from a violation of his constitutional rights or by a fundamental error of law. Pirtle, 136 Wash.2d at 482, 965 P.2d 593.

B. Prosecutor's Plea Agreement With Frye
¶ 32 Monschke claims that the prosecutors encouraged Frye to commit perjury by entering a favorable plea agreement that required her to testify against Monschke. Monschke further alleges that Frye's favorable plea agreement was obtained because Pierce County Prosecutor Gerald Horne was friends with Judith Mandel, Frye's defense attorney. Monschke also argues that correspondence between Pillatos and Frye indicated that they were "`fabricating a story in an attempt to perpetrate a fraud on the Court and the prosecutor's office.'" Br. of Pet'r at 35 (quoting PRP, Decl. of Barbara Corey (Dec. of Corey) at 2).
¶ 33 In support of his claim of prosecutorial misconduct, Monschke submitted an affidavit from Barbara Corey, a former prosecutor who represented the State in this case before Frye, Butters, and Pillatos entered the plea agreements. Corey opines that (1) Pillatos and Frye "were indeed fabricating a story in attempt to perpetrate a fraud on the Court and the prosecutor's office"; (2) Prosecutors Horne, Costello, and Greer knew of Pillatos and Frye's plan to manipulate the trial; and (3) Frye's favorable plea agreement was based on a personal friendship between Mandel and Horne. Dec. of Corey at 2.
¶ 34 The State's affidavits from the two prosecutors, Gregory Greer and Gerald Costello, who executed the plea agreement with Frye, maintain that (1) Corey had personal animosity against Mandel; (2) Horne was not involved in the decision to offer Frye a plea; *895 and (3) the plea offered to Frye was not based on any personal relationship with Frye's attorney but, because she "was least culpable of the four co-defendants." Br. of Resp't at 18, App. M at 5. These affidavits demonstrate the State's legitimate purpose in offering Frye a plea agreement. Br. of Resp't, App. O at 2 ("Mr. Greer and I decided to enter into an agreement with Ms. Frye because she was convincing, credible, and the least culpable."). Additionally, the State provided Frye's plea agreement to the defense, which they used to cross-examine Frye.
¶ 35 Moreover, even if Frye had not testified against Monschke, the State would have offered the testimony of Butters, Pillatos, and two other witnesses to the crime, Terry Hawkins and Cindy Pitman.[10] Thus, Monschke has not established improper conduct by the prosecutor in entering a plea agreement with Frye, nor has he shown any prejudicial effect arising from the plea deal. His prosecutorial misconduct claim based on Frye's plea and testimony on behalf of the State fails.
¶ 36 Monschke also argues that the State committed misconduct by having Frye testify when it knew that Frye and Pillatos had communicated about their testimony. "It is fundamentally unfair for a prosecutor to knowingly present perjury to the jury" and "the use of known lies to get a conviction deprives a defendant of his constitutional right to due process of law." U.S. v. LaPage, 231 F.3d 488, 491 (9th Cir.2000). Conflicting witness testimony does not demonstrate that the witnesses committed perjury or that the prosecutor knew of any alleged perjury. Additionally, "[c]redibility determinations are for the trier of fact and cannot be reviewed on appeal." State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990).
¶ 37 Here, Monschke; Frye, Butters; and Pillatos all testified at Monschke's trial. And although their testimony differed about the sequence of events the night of the murder and Monschke's participation in the assault on Townsend, the defense had the opportunity to cross-examine and impeach all of Monschke's codefendants, particularly Frye and Pillatos, using the known content of their communications before they entered their pleas and before they testified. On cross-examination, Monschke's counsel confronted Frye about only one letter she had written from jail, and it was one she had written to Monschke, not Pillatos.
¶ 38 Our review of other jail correspondence Frye wrote shows that, although she wanted direction from Pillatos, she also demonstrated remorse and repeatedly discussed her intention to tell the truth and her desire for Pillatos to support her decision to testify truthfully.[11] It is likely that if the defense *896 had attempted to impeach Frye with the letters she wrote Pillatos or others that the State would have responded by introducing the numerous letters wherein she wrote about telling the truth and wanting to take a polygraph examination. Therefore, defense counsel likely made the tactical decision not to attempt to impeach Frye based on her communication with Pillatos because they knew the attempt would be unsuccessful and might open the door to evidence that would bolster her credibility with the jury.
¶ 39 Furthermore, Monschke has not demonstrated that Frye committed perjury, as he failed to identify what portion of Frye's testimony constituted perjury. He points only to the prosecutors' knowledge that Pillatos and Frye communicated about assisting each other, which knowledge the prosecutors shared with the court and defense when they discovered these communications, making all aware of their violation of the court's order. Monschke's prosecutorial misconduct claims fail.
¶ 40 Because Monschke fails to establish prejudice arising from constitutional error, a fundamental defect which inherently results in a complete miscarriage of justice or the existence of material disputed issues of fact, we deny his personal restraint petition.
¶ 41 A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: ARMSTRONG, and HUNT, JJ.
NOTES
[1] The facts are limited to those necessary to evaluate Monschke's PRP. The opinion from Monschke's first appeal, State v. Monschke, 133 Wash.App. 313, 135 P.3d 966 (2006), contains a more detailed fact summary.
[2] "According to Frye, red shoelaces symbolized that the wearer had assaulted a member of a minority group." Monschke, 133 Wash.App. at 323, 135 P.3d 966.
[3] Officers investigating the murder "found hate-based graffiti near the murder scene [that] included swastikas, lightning bolts in the shape of `SS,' `White Power Skinheads,' `U Suck Wiggers,' `El Spic,' `Skinhead white to the bone,' `Die SHARPS,' `Die Junky Die,' `El Nigger,' `Tacoma Skinhead Movement,' `die niggers,' `Heil Hitler,' and `Fuck All Drug Addicts.'" Monschke, 133 Wash.App. at 320, 135 P.3d 966 (quoting 21 RP at 940; 26 RP at 112, 116, 118-19, 121-22).
[4] As noted in Monschke, the four defendants' testimony differed on this fact: "Pillatos testified that Monschke hit Townsend in the head with the bat three or four times. Monschke and Butters testified that Monschke was somewhere else during the entire assault and that he used the bat afterwards simply to nudge Townsend to see if he was still alive. Butters also testified that he told officers that Monschke hit Townsend 10 or more times." 133 Wash.App. at 324, 135 P.3d 966.
[5] "A pair of lightning bolts in the shape of `SS' is a neo-Nazi symbol." Monschke, 133 Wash.App. at 320 n. 2, 135 P.3d 966.
[6] On Monschke's direct appeal, we noted the following evidence that supported his conviction:

Monschke was a member of the white supremacist subgroup Volksfront; Volksfront associated with the violent subgroup National Alliance; Monschke wanted to advance his position in Volksfront and open a local chapter; acts of violence elevated a member's status in many white supremacist subgroups; Volksfront maintained a POW list on its website that supported individuals who had committed violent hate crimes; Monschke posted messages on Volksfront's website and used a screen name, "SHARPshooter," that advocated violence against a nonviolent white supremacist group; Monschke sought to elevate Frye's status by helping her obtain red shoelaces, which Monschke believed were earned by violent acts against "inferior" people; Monschke previously advanced his own position in Volksfront through violent acts and wore red shoelaces and white suspenders as an indication of this advancement; Monschke, Butters, and Pillatos were underneath Interstate 705 looking to "do" someone "inferior"; Townsend was viewed as inferior by Monschke, Butters, and Pillatos; Townsend's murder elevated Butters's status; and Monschke wondered aloud whether Townsend's murder would elevate his status with God.
Monschke, 133 Wash.App. at 333-34, 135 P.3d 966.
[7] Monschke is under a "restraint" as he is confined under a judgment and sentence resulting from a decision in a criminal proceeding. RAP 16.4(b).
[8] RAP 16.11(b) states that the Chief Judge can dismiss a PRP or a panel of judges may deny a PRP.
[9] In Crace, we further explained our holding that the prejudice prong of the ineffective assistance of counsel analysis was not heightened in the PRP context:

The reliability of a proceeding is undermined where the petitioner shows how "defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." State v. McFarland, 127 Wash.2d 322, 335, 899 P.2d 1251 (1995). Our Supreme Court has referred to "`reasonable probability'" as "`a probability sufficient to undermine confidence in the outcome' of [the] trial." In re Pers. Restraint of Hutchinson, 147 Wash.2d 197, 208, 53 P.3d 17 (2002) [(alteration in original)] (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). And this court, our Supreme Court, and the United States Supreme Court have referred to the showing of prejudice in the ineffective assistance of counsel context to be a showing of "actual prejudice." Smith v. Robbins, 528 U.S. 259, 286, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); State v. Crawford, 159 Wash.2d 86, 97, 147 P.3d 1288 (2006); State v. Contreras, 92 Wash.App. 307, 319, 966 P.2d 915 (1998); see McFarland, 127 Wash.2d at 338, 899 P.2d 1251; Thomas 109 Wash.2d at 225-26, 743 P.2d 816; see also In re Pers. Restraint of Dalluge, 152 Wash.2d 772, 789 n. 10, 100 P.3d 279 (2004); In re Pers. Restraint of Yim, 139 Wash.2d 581, 590, 989 P.2d 512 (1999); State v. Sosa, 59 Wash.App. 678, 686-87, 800 P.2d 839 (1990); Dorsey v. King County, 51 Wash.App. 664, 674, 754 P.2d 1255 (1988).
Washington courts granting petitions based on ineffective assistance of counsel have only stated that the petitioner established the "reasonable probability" standard from Strickland. [In re Pers. Restraint of] Brett, 142 Wash.2d [868,] 883[, 16 P.3d 601 (2001)]; In re Pers. Restraint of Fleming, 142 Wash.2d 853, 866-67, 16 P.3d 610 (2001); In re Pers. Restraint of Hubert, 138 Wash.App. 924, 930-32, 158 P.3d 1282 (2007); In re Pers. Restraint of Sims, 118 Wash.App. 471, 478, 480, 73 P.3d 398 (2003); In re Pers. Restraint of Hoisington, 99 Wash. App. 423, 434-35, 993 P.2d 296 (2000); see In re Pers. Restraint of McCready, 100 Wash.App. 259, 265, 996 P.2d 658 (2000).
157 Wash.App. at 110-12, 236 P.3d 914 (footnote omitted).
[10] Hawkins told police that he saw three men and a woman kicking dirt and hitting at the ground; at trial, he testified that he saw two men swinging bats, a woman kicking, and a third man standing four feet away. Pitman told police and later testified that she saw three men with shaved heads swinging and kicking but did not see a woman.

Monschke, 133 Wash.App. at 319, 135 P.3d 966.
[11] ("I'm going to have to [d]o things I really [d]on't want to for my freedom. Like testify to what I saw. All of it. Even the parts I want to leave out."); ("I'm gonna have to be real and tell the truth."); ("Anyhow, ask David what he wants me to [d]o. I am not ready to [d]ecide on my own, this baby is ½ his."); ("All I care about is David! I need to know what he wants me to do? To me it seems I have no way out. What about baby?"); ("I am soo irritated with not knowing what to do. I[d]on't want to end up having David hate me or you or anyone else you know!"); ("My attorney promises good things but I have to be 100% honest and go with whatever she says. The Lord told me to do the same."); ("[R]egardless I am going to tell the whole truth."); ("Don't worry about me, I'm gonna do what I have to do to get out of here and raise your child and be with you in your life again. I will testify, take a polygraph, whatever my lawyer says so long as I can raise this baby."); ("Tell [D]avid I am really sorry I've gotta do this but I want to be free for our child and him too, if he gets out any time or if he doesn't!"); ("I am doing everything in my power to tell the truth and be able to raise our son."); ("The full truth has to be known and I need to have faith that God will see that through. He wants justice and even in the Bible it says not to lie in court."); ("I have also been thinking deeply about this mess and how I ended up in it. I can't believe it even happen[e]d. It still messes with me every day."); ("It'll probably hurt all of the boys but I have to tell the truth and go home [a]nd be a mom."); ("I have to testify ag[ai]nst one of the boys first. The other two plead already. I'm looking at 165 months. I'm gonna miss out on a big piece of life but at least I know that by testifying the truth will be out and I can have a little piece [sic] of mind."). Br. of Resp't, App. S at 1650, 1651, 1695, 1721, 1725, 1785, 1826, 1845, 1990, 2528, 2599, 2662, 5412, 6522.