IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83523-8-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JOHNSON, MICHEALOB IKE, | |
| Appellant. | |

BOWMAN, J. — A jury convicted Michealob Ike Johnson of aggravated first degree murder and first degree attempted murder. Johnson appeals, arguing his attorneys were ineffective because they failed to adequately prepare his expert witness. We affirm.

FACTS

Around 10:00 p.m. on April 22, 2019, 25-year-old Johnson entered Broadway Grocery in Everett. Johnson first walked to the refrigerators at the back of the store and grabbed a bottle of water, then he approached the checkout counter. Store security camera footage from behind the register shows Johnson wearing a blue, plastic, make-shift poncho and clear disposable gloves.

As he approached the counter, Johnson unsheathed a large dagger with an eight-inch blade from his waist and held it hidden at his side.[1] At the counter, Johnson set down the bottle of water. As the cashier, Jae An, entered his

_____

[1] Johnson also carried two pocket knives.

purchase in the register, Johnson stabbed him in the throat with the dagger. As Jae An fell to the floor, Johnson tried to stab him in the throat again but missed. Johnson then hurried toward the front door but "panicked" and returned inside, trying unsuccessfully to lock the door behind him. When he walked back to the counter, Johnson saw Jae An was still moving, so he stabbed him in the throat two more times. Jae An died from the stab wounds. Johnson then took Jae An's wallet and tried to open the till.

Meanwhile, Carlee Cordes drove her boyfriend's pickup truck into the store parking lot. Her friend Lenny Backstrom waited in the truck while she walked into the store. When Cordes entered the store, Johnson attacked her near the door, grabbing her and attempting to cut her throat. But Cordes grabbed the blade and eventually pulled it out of the handle while she struggled with Johnson. Cordes then swung the blade at Johnson and was able to get away from him. She ran back to the truck and drove away.[2]

Johnson then walked home and confessed to his roommate, Kenneth Haala, and Kenneth's[3] sister, Suzanne Haala, who was at the home visiting her mother.[4] They were surprised to see Johnson because they thought he was in

---

[2] As Cordes ran to the truck, screaming, she dropped the blade, and Backstrom got out of the truck. Johnson picked up the blade and "pop[ped]" it back into the handle, which he was still holding. He then "made a running motion at [Backstrom] with the blade first," and Backstrom quickly turned around and got back in the truck.

[3] We refer to the members of the Haala family by their first names for clarity and mean no disrespect by doing so.

[4] Kenneth and Suzanne's mother, Anna Haala, owns the home. She was also in the living room when Johnson confessed, but she was asleep "[i]n her chair."

his bedroom all night.[5] Johnson was holding a bloody knife and wearing a poncho "covered in blood." He said, "I just robbed this store" and "murdered the man in the corner store." Johnson said he "made a mistake" and told Kenneth to call 911. But Kenneth had no cell phone reception, so he walked about six blocks to the local fire station, and fire personnel alerted the police. Police, who were already en route to Broadway Grocery, arrived at the Haala residence and arrested Johnson.

During police questioning immediately following his arrest, Johnson confessed again to killing Jae An. He told police that he intended only to rob Broadway Grocery, but something " 'just snapped,' " and " 'the next thing I knew my dagger was in [Jae An's] throat.' " Johnson said that when Cordes came in, he " 'knew she would figure it out soon[,] so I turned on her. . . . I snapped.' " The State charged Johnson with aggravated first degree murder of Jae An and attempted first degree murder of Cordes.

The jury trial began in September 2021. Johnson argued that his actions were not premeditated. He presented testimony from Dr. Tyson Bailey, a board-certified clinical and forensic psychologist and expert on trauma, dissociation, and other posttraumatic states. Dr. Bailey testified that he interviewed Johnson twice and conducted psychological assessments. Based on Johnson's interview and assessment responses, Dr. Bailey formed an initial opinion that Johnson experienced mental and physical abuse from caregivers throughout his childhood

---

[5] Johnson later told police that he snuck out his bedroom window and "left some noise on so they thought I was in my room" while he committed the crimes.

and adolescence and showed symptoms of post-traumatic stress disorder (PTSD) and dissociative disorder.

Dr. Bailey testified that he then reviewed "somewhere between [300] and [400] total" pages of discovery, including the police reports and their interview of Johnson, Johnson's school records, and documents from Child Protective Services (CPS), the Department of Children, Youth, and Families (DCYF), and two mental health facilities that treated Johnson. After reviewing the information, Dr. Bailey issued an initial, written, forensic evaluation on December 17, 2019.

Dr. Bailey testified that defense counsel then asked him to clarify his opinion on whether Johnson's actions were premeditated. So, for the first time, Dr. Bailey reviewed the security camera videos of the incident and a video of Johnson's police interview. He issued an addendum to his report on April 1, 2021. In the addendum, Dr. Bailey diagnosed Johnson with complex PTSD and unspecified dissociative disorder. He noted that the store video showed Johnson had a "blank-faced disconnected affect." And he opined that based on the video, he believed Johnson was in a dissociative state when he killed Jae An and attacked Cordes. Ultimately, Dr. Bailey testified that because "Johnson appeared to be in a dissociative state at the time of the incident," he "very likely engaged in the action in an impulsive and non-premeditative manner."

On cross-examination, the State asked Dr. Bailey to identify which documents he reviewed in preparation for his assessment. After referring to his report, Dr. Bailey explained that he reviewed "approximately 269 pages of

4

discovery." The prosecutor then asked Dr. Bailey if he would "be surprised to learn that the State's discovery in this case exceeded 1600 pages."

One of Johnson's attorneys objected, arguing that the State's "questioning about the number of pages in discovery is misleading to the jury." She stated that much of the discovery has "nothing to do with" Dr. Bailey's testimony, so she did not send those records to him. The attorney explained that when she sent Dr. Bailey the 269 pages of discovery, it was the first round of discovery defense received and "all we had." She did not receive additional discovery until after Dr. Bailey wrote his initial report. And after receiving the new discovery materials, which included police reports and transcripts of interviews with Kenneth, Suzanne, and Cordes, she did not send them to Dr. Bailey because she did not believe they were relevant to his ability to form an opinion on premeditation.

The court offered to recess trial and give Dr. Bailey time to review the extra discovery, but defense counsel declined. When trial resumed, a portion of the State's cross-examination focused on the discovery that Dr. Bailey did not review. The jury convicted Johnson on both counts as charged, including the aggravating factor that he committed first degree murder in furtherance of committing robbery.[6]

Johnson appeals.

---

[6] The court also instructed the jury on the lesser included crimes of second degree murder of Jae An and attempted second degree murder of Cordes.

5

ANALYSIS

Johnson argues he received ineffective assistance of counsel at trial because his attorneys "failed to adequately prepare [Dr. Bailey], thereby ruining [his] sole trial defense."

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011) (citing Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). We review ineffective assistance of counsel claims de novo. State v. K.A.B., 14 Wn. App. 2d 677, 707, 475 P.3d 216 (2020).

To establish ineffective assistance of counsel, a defendant must show that their attorney's performance was deficient and that prejudice resulted from the deficiency. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). An attorney's performance was deficient if "it fell below an objective standard of reasonableness based on consideration of all the circumstances" and the record below. Id. Deficient representation prejudices the defendant if there is a reasonable probability that but for counsel's error, the result of the trial would have been different. Id. at 335.

To determine whether counsel's performance was deficient, we " 'engage in a fact-specific inquiry into the reasonableness of an attorney's actions.' " K.A.B., 14 Wn. App. 2d at 706-07 (quoting In re Pers. Restraint of Yung-Cheng Tsai, 183 Wn.2d 91, 99, 351 P.3d 138 (2015)). A defendant alleging ineffective assistance must overcome a strong presumption that counsel's performance was

6

reasonable. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). If a defendant fails to show deficient performance, we need not reach prejudice, and our inquiry ends. Id.

When counsel's conduct can be characterized as legitimate trial strategy or tactic, it cannot serve as the basis for a claim of ineffective assistance. State v. Prado, 144 Wn. App. 227, 248, 181 P.3d 901 (2008). Generally, an attorney's decision to call a witness is " 'a matter of legitimate trial tactics,' which 'will not support a claim of ineffective assistance of counsel.' " In re Pers. Restraint of Monschke, 160 Wn. App. 479, 492, 251 P.3d 884 (2010) (quoting State v. Byrd, 30 Wn. App. 794, 799, 638 P.2d 601 (1981)). But a defendant can overcome this presumption by showing that their attorney failed to conduct appropriate investigations to determine what defenses were available, adequately prepare for trial, or subpoena necessary witnesses. In re Pers. Restraint of Davis, 152 Wn.2d 647, 742, 101 P.3d 1 (2004).

Johnson argues his trial attorneys did not adequately prepare Dr. Bailey for trial because they "failed to provide all discovery documents necessary for [him] to competently diagnose Johnson and testify on the only issue that mattered — whether Johnson premeditated his crimes." We disagree.

The record shows Johnson's attorneys provided Dr. Bailey with all the discovery they had at the time and then supplemented that discovery with videos. And that discovery, combined with Dr. Bailey's interviews and psychological assessments, was sufficient for him to reach an opinion that Johnson did not act with premeditation.

7

The record also shows that Johnson's attorneys made a tactical decision not to provide Dr. Bailey with all the discovery. While the record does not contain the excluded discovery, the trial transcript shows it included interviews of Johnson's roommate Kenneth, Kenneth's sister Suzanne, their mother Anna, and Cordes.[7] Johnson's attorneys told the trial court that they reviewed the documents and determined they need not provide them to Dr. Bailey. They explained that because Dr. Bailey's opinion on premeditation centered on Johnson's actions before and during the incident, Kenneth, Suzanne, and Anna's accounts about what happened before and after the incident were not relevant to his opinion. And while Cordes was at the store during the incident, one of Johnson's attorneys "made the call" not to give Dr. Bailey Cordes' interview transcript because "there was nothing in there that was different than what had already been summarized in [the] police reports" he reviewed.[8]

Johnson argues that this case is like K.A.B.. There, the State charged a juvenile defendant with custodial assault. K.A.B., 14 Wn. App. 2d at 686-87. Before trial, the defendant's attorney designated the defendant's psychiatrist as an expert witness. Id. at 689. At a pretrial hearing, the attorney said she expected the psychiatrist would testify that the defendant "experience[d]

---

[7] The excluded discovery also included several detectives' reports, a sergeant's report, an officer's report, the medical examiner's report, Backstrom's interview transcript, and a report from the Washington State Patrol Crime Laboratory.

[8] We note that Johnson's lawyers also told the court that "one of the reasons why we don't provide the entire discovery to our experts is because we can't afford to pay them to review all of the records. So we provide them the records that we think are sufficient for them to maintain their — or create their opinion on." While it may not always be necessary to provide expert witnesses with "the entire discovery," we caution that financial concerns alone do not justify inhibiting the rights of indigent criminal defendants. See State v. Wilson, 144 Wn. App. 166, 180, 181 P.3d 887 (2008).

excessive aggression and hostility" while in detention because she took a "high dosage of fluoxetine." Id. at 709. The attorney told the court that the expert's testimony was intended to support a defense of diminished capacity. Id.

The psychiatrist had progress notes from previous sessions with the defendant, but the attorney did not provide the doctor with video of the incident or any prior treatment reports. K.A.B., 14 Wn. App. 2d at 709. The trial court twice warned the attorney that she must obtain a forensic report from the expert with an opinion relevant to an element of the crime, and that the progress notes with no forensic analysis lacked any kind of conclusion relevant to diminished capacity. Id. at 709-10. Still, the attorney never asked the psychiatrist to opine on the defendant's ability to form criminal intent either before or during trial. Id. at 710. The juvenile court convicted the defendant of custodial assault. Id. at 693.

In a personal restraint petition, the defendant argued that she received ineffective assistance of counsel because her attorney failed to adequately prepare and present a diminished capacity defense. K.A.B., 14 Wn. App. 2d at 694-95. Division Two of this court agreed. Id. at 711. The court concluded that the attorney performed deficiently because she failed to properly raise the diminished capacity defense despite the juvenile court instructing her on its requirements:

> There is no strategic justification for trial counsel's failure to provide [the psychiatrist] with relevant information or to ask that he opine on [the defendant]'s ability to form intent given the law on diminished capacity and the juvenile court's repeated guidance . . . about what was required to lay the foundation for this defense.

Id.

This case is different than K.A.B. Here, Johnson's attorneys recognized lack of premeditation as a potential defense to the crime. They investigated the defense and retained Dr. Bailey to assess Johnson's mental state. They arranged for Dr. Bailey to interview Johnson and conduct psychological assessments. And they provided Dr. Bailey with police reports, videos of the incident and Johnson's interview with police, Johnson's school records, and documents from CPS, DCYF, and two mental health facilities that treated Johnson. Based on that information, Dr. Bailey formed an opinion that Johnson did not act with premeditation, and he expressed that opinion to the jury at trial. On these facts, Johnson fails to show that his attorneys were deficient.[9]

We affirm Johnson's convictions.

_____
Brennan, J

WE CONCUR:

_____         _____
Feldman, J.                              Hazelrigg, ACJ

---

[9] Johnson argues that his attorney's deficient conduct prejudiced him by providing "fodder" for cross-examination. Because Johnson fails to show his attorneys were deficient, we do not address prejudice. Kyllo, 166 Wn.2d at 862.