# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 51119-3-II |
| JENNIFER LYNN MOTHERSHEAD, | |
| Petitioner. | UNPUBLISHED OPINION |

GLASGOW, J.—In 2013, a jury convicted Jennifer Lynn Mothershead of first degree assault of a child. Between March and May 2011, Mothershead put prescription eye drops that had been contaminated with bleach into the eyes of her 13-month-old daughter, who suffered painful damage to her eyes and permanent vision loss. Mothershead received an exceptional 480-month sentence based on the jury's finding of three aggravating factors.

Mothershead filed a personal restraint petition (PRP), challenging her conviction on several grounds, including ineffective assistance of counsel. Mothershead's two main ineffective assistance claims are that her counsel was ineffective (1) when she did not retain or continue consulting with an expert after commissioning him for an initial assessment of the scientific evidence, and (2) when she did not elicit a statement from Mothershead during her testimony directly denying that she added anything to the eye drops.

Neither of these ineffective assistance claims merits reversal or a reference hearing. Mothershead has not shown that she was prejudiced by counsel's failure to retain an expert because she has not shown what the expert would have said or a reasonable likelihood that expert testimony would have changed the outcome of her trial. Mothershead also has not shown that she was

prejudiced by counsel's failure to ask whether she added anything to the eye drops because counsel posed questions at the end of her direct examination that elicited the functional equivalent of a denial. We also hold that none of Mothershead's multiple other arguments entitles her to relief.

We deny Mothershead's PRP.

FACTS

Jennifer and Cody Mothershead married in 2007. They had a daughter, KM, in February 2010. Jennifer[1] and Cody were friends with another couple, Matthew Bowie and Courtney Valvoda.[2]

At some point in 2010, Jennifer and Matthew began having an affair, unbeknownst to Cody and Courtney. By early 2011, Jennifer and Cody were separated, and Jennifer was staying most nights with Matthew and Courtney at their home in Black Diamond, Washington.

Jennifer was KM's primary caretaker, and Cody saw KM rarely. Courtney worked full time and was gone most of the day. Matthew worked sporadically in construction. Jennifer stayed home with KM.

On March 23, 2011, Jennifer went horseback riding. KM played in the barn while Matthew watched her. When Jennifer returned, KM's left eye was swollen and "'red around the edges,'" so Jennifer took KM to her family physician, Dr. James Merril. *State v. Mothershead*, No. 73634-5-I, slip op. at 3 (Wash. Ct. App. Mar. 28, 2016) (unpublished), http://www. courts.wa.gov/opinions/pdf/736345.pdf. He thought KM had a scratched cornea, but could not find

---

[1] We refer to Jennifer Mothershead by her first name only in the beginning of the facts section to distinguish her from Cody, but we refer to her as "Mothershead" throughout the rest of the opinion.

[2] Courtney Valvoda became Courtney Bowie when she married Matthew Bowie in 2011.

evidence of a foreign body in KM's eye, so he referred her to Mary Bridge Children's Hospital in Tacoma. The doctor at Mary Bridge was not able to detect any foreign body, but he prescribed antibiotic ointment.

When Dr. Merril saw KM again on March 29, 2011, both of her eyes were red and her eyelids were peeling and bleeding. He referred KM to Seattle Children's Hospital, where she was ultimately seen by the chief of the ophthalmology department, Dr. Avery Weiss, on April 11, 2011.

Between April 11 and May 12, 2011, KM's condition continued to worsen. KM's eyes became nearly swollen shut, she was extremely light sensitive, her eyelids were red and irritated, and blood vessels began growing into her corneas. Despite multiple office visits, tests, and research by top experts at Seattle Children's Hospital, no one could determine the cause of KM's worsening symptoms. Because her condition appeared most consistent with a bacterial infection, KM's doctors prescribed strong antibiotics (tobramycin and cefazolin), corticosteroid eye drops, generic polysporic ointment, and oral antibiotics.

KM's tobramycin and cefazolin were eye drops that had to be applied four times a day. Jennifer usually administered them, often with Matthew's or Courtney's help. KM "'fought'" against having the drops put in her eyes, and this required more than one person because someone had to hold KM down. *Id.* at 24. Matthew sometimes administered the eye drops. Courtney testified that she may have also given the eye drops to KM herself. Cody testified at trial that he watched Matthew administer the drops once, but never did it himself.

On May 11, 2011, Matthew and Courtney noticed that KM had a "'soft spot'" on her head. *Id.* at 6. Courtney insisted that she and Jennifer take KM to the doctor. The Enumclaw Medical

Center doctor who saw KM did a CAT[3] scan and found a subdural hematoma. KM was airlifted to Harborview Medical Center.

Harborview doctors diagnosed KM with a traumatic brain injury. *Id.* at 8. A hospital social worker interviewed Jennifer, Courtney, and Cody when they arrived at Harborview because they suspected child abuse. Harborview doctors also asked to examine the eye drops that Jennifer had brought with her to Harborview.

Two Pierce County Sheriff's detectives observed KM's condition and interviewed Jennifer, Courtney, and Cody. The detectives then placed KM in protective custody. One of the Harborview doctors then opened the bottle containing KM's eye medications. "'[N]oxious smells filled the room'" triggering "'eye burning and nausea.'" *Id.* at 11. The detectives examined the medications and also experienced the noxious odor and burning sensations. The detectives acquired control samples of KM's eye drops from the Seattle Children's Hospital pharmacy for comparison and brought the medications to the Washington State Patrol Crime Laboratory, where they were placed in the evidence room.

Forensic scientists with the State Patrol crime lab and the United States Food and Drug Administration (FDA) analyzed KM's eye drops and the control samples, and all of them observed differences between the tobramycin that KM had been receiving and the control sample. Based on their tests, the FDA chemists concluded that KM's tobramycin appeared to have been contaminated with bleach.

Mothershead was charged with first degree assault of a child under RCW 9A.36.120(1)(b)(i), (ii)(A) and (ii)(B). Mothershead's trial lasted one month. Dozens of witnesses

---

[3] Computerized axial tomography.

testified for the State, including 15 expert witnesses. Ten medical doctors who were involved in KM's treatment testified about the nature of KM's eye condition, their unsuccessful efforts to diagnose and treat her, and the causes they considered as possible explanations for KM's symptoms.

Five forensic chemists from the FDA testified about the chemical composition of the tobramycin eye drops. They agreed that KM's eye drops contained chloride, a by-product that would be expected if the eye drops had been contaminated with bleach.

The defense did not call its own expert witness to testify at trial. Defense counsel cross-examined the State's experts, seeking to discredit their testimony and cast doubt on the State's scientific evidence.

However, the dominant defense theory did not depend on raising doubt about the State's conclusions that a foreign chemical substance had been added to the eye drops. The defense instead focused on creating reasonable doubt that Mothershead was the one who tampered with the eye drops. During cross-examinations of the State's witnesses and during direct examination of Mothershead, the defense developed the theory that someone else had contaminated the eye drops.

During her testimony, Mothershead did not directly deny that she did not tamper with or add anything to the eye drops. But her defense counsel's final direct examination question was: "Do you have any personal knowledge as to what's been described from these drops of being a dark color and smell and all that stuff?" Verbatim Report of Proceedings (VRP) (Oct. 1, 2013) at 131. Mothershead responded, "No. That's nothing that I've seen." *Id.*

In closing, the defense pointed out inconsistencies in the doctors' testimony, emphasized testimony about other potential causes of KM's eye problems, and questioned whether the State

Patrol crime lab's testing of the eye drops was "scientific." VRP (Oct. 3, 2013) at 61. But the defense essentially conceded that the drops were contaminated with a "noxious" substance, arguing instead "that's not stuff that Jenny did to it." VRP (Oct. 3, 2013) at 63. Counsel argued that Mothershead did not act guilty—she kept bringing KM back to doctors, she answered the detectives' questions, and she voluntarily handed over the eye drops. Counsel also emphasized that Mothershead was not present just before KM's first eye injury in the barn, nor was she present just before KM's head injury was discovered.

The jury convicted Mothershead of first degree assault. The jury also found by special verdict that Mothershead used her position of trust to facilitate commission of the crime, that Mothershead's conduct manifested deliberate cruelty to KM, and that Mothershead knew or should have known that KM was a particularly vulnerable victim. Based on the special verdicts, the trial court sentenced Mothershead to an exceptional sentence of 480 months, followed by 36 months of community custody, and a prohibition on contact with minor children.

Mothershead filed a timely appeal. *Mothershead,* No. 73634-5-I, slip. op. at 1-2. Division One affirmed the judgment and sentence. *Id*. at 2. Mothershead timely filed this PRP.

ANALYSIS

A.     PRP Standards

Relief via a collateral challenge to a conviction is an "extraordinary" remedy, and a petitioner bringing a PRP "must 'meet a high standard before [we] will disturb an otherwise [final] judgment.'" *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013) (quoting *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011)). A personal restraint petitioner must establish that his or her restraint was the product of either a constitutional error that

caused "actual and substantial prejudice" or a nonconstitutional fundamental defect that "'inherently result[ed] in a complete miscarriage of justice.'" *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810-12, 792 P.2d 506 (1990)). The petitioner must prove error by a preponderance of the evidence. *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). We hold a pro se petitioner to the same standard as an attorney. *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 328, 394 P.3d 367 (2017).

When considering whether an error alleged in a PRP was prejudicial, courts look to "the practical effects that result from the error." *In re Pers. Restraint of Yates*, 180 Wn.2d 33, 41, 321 P.3d 1195 (2014); *see also State v. Buckman*, 190 Wn.2d 51, 64, 409 P.3d 193 (2018). The petitioner has the burden of proving prejudice by a preponderance of the evidence under the totality of the circumstances. *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013). The petitioner must support the petition by identifying the facts on which the claims are based and the evidence supporting the factual allegations. RAP 16.7(a)(2)(i); *Monschke*, 160 Wn. App. at 488. The petitioner cannot "rely solely on conclusory allegations." *Id*.

In evaluating a timely PRP, we have three options. We may: (1) deny the PRP "if the petitioner fails to make a prima facie showing of constitutional or nonconstitutional error" resulting in prejudice, (2) remand for a reference hearing "if the petitioner makes a prima facie showing but the merits of the contentions cannot be determined solely from the record," or (3) grant the PRP with no hearing if the petitioner has proved both the required error and actual prejudice or a miscarriage of justice. *In re Pers. Restraint of Stockwell*, 160 Wn. App. 172, 176-77, 248 P.3d 576 (2011).

"If the petitioner's allegations are based on matters outside the existing record, [they] must demonstrate . . . competent, admissible evidence to establish the facts that entitle [them] to relief." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). A party's own affidavit, without corroborating evidence, may be insufficient to create a material disputed issue of fact warranting a reference hearing. *In re Pers. Restraint of Reise*, 146 Wn. App. 772, 789, 192 P.3d 949 (2008).Where a petitioner relies on the knowledge of others to support a request for a reference hearing, the petitioner must present a declaration or other corroborative evidence, rather than merely speculating about what that person might say. *Rice,* 118 Wn.2d at 886. The declarant must establish that the person can competently testify about the subject matter discussed in the declaration. *Id.* The State is held to this same standard in its response. *Reise*, 146 Wn. App. at 780; *see also* RAP 16.9.

B.     Ineffective Assistance of Counsel

Mothershead raises several claims of ineffective assistance of counsel, contending that they entitle her to a grant of her PRP, or at least a reference hearing. All of these claims lack merit.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Ineffective assistance of counsel is a two-pronged inquiry. *Grier*, 171 Wn.2d at 32. To prevail, Mothershead must show that her counsel's performance was deficient and that counsel's deficient performance prejudiced her. *Id.* at 32-33. A failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Appellate courts apply "exceptional deference" when "evaluating counsel's strategic decisions," and "[i]f trial counsel's conduct can be characterized as legitimate trial strategy or tactics," it will not support a claim of ineffective assistance. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). "To rebut the presumption of reasonableness, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). The petitioner must prove that "counsel's performance fell below an objective standard of reasonableness in light of all the circumstances." *Id.* at 538.

The petitioner must also prove prejudice. A petitioner must show that, but for counsel's deficient performance, "there is a reasonable probability that the result of the proceeding would have been different." *Id.* We examine the "practical effects" of alleged ineffective assistance. *Yates*, 180 Wn.2d at 41; *see also Buckman*, 190 Wn.2d at 64. "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice" for PRP purposes. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

1.      Defense expert

Mothershead first argues that her trial counsel provided ineffective assistance of counsel because she did not "adequately investigate a qualified defense expert's exculpatory opinion." Pet'r's Suppl. Opening Br. at 18-19, 22. Even if this were deficient performance, an issue we do not decide, Mothershead has not demonstrated any resulting prejudice.

While preparing for trial, Mothershead's counsel contacted Richard Pleus PhD, the director of a private Seattle-based toxicology consulting firm. Dr. Pleus has a "post-doctoral specialization

in neuropharmacology and experience as a lecturer in eye toxicology." *Id.*, App. A at 2-3. Mothershead's counsel requested and received $5,000 from the Department of Assigned Counsel for initial funding to retain Dr. Pleus.

Mothershead's counsel sent Dr. Pleus lab data from the eye drop tests from the State Patrol crime lab and the FDA laboratory. She also sent Dr. Pleus KM's medical records and information about the history of the case. In response, Dr. Pleus sent two letters to Mothershead's counsel. In the first, he gave what he referred to as his "initial opinion, subject to completing my research thoroughly." *Id.*, App. B at 1. His initial opinion was that "the data provided . . . does not scientifically support the Plaintiff's case that the medication that was administered to [KM] caused the adverse effects that are reported in the medical records." *Id.* Dr. Pleus further noted, "I have considered a number of possible scenarios, including that Ms. Mothershead did adulterate the medication." *Id.* Dr. Pleus briefly described the "general scope of work" required to complete his review and estimated that it would cost an additional $8,000 to complete. *Id.*

In his second letter to trial counsel, Dr. Pleus reiterated his initial opinion and indicated that he still needed to complete review of the forensic lab reports and other documents that had already been provided. Mothershead's counsel requested additional funding from the Department of Assigned Counsel to continue working with Dr. Pleus, but her request was denied. She did not continue pursuing Dr. Pleus's investigation. *Id.*

When a petitioner's evidence "is based on knowledge in the possession of others," the petitioner "must present their affidavits or other corroborative evidence" explaining what that person would say. *Rice*, 118 Wn.2d at 886; *see also In re Pers. Restraint of Davis*, 152 Wn.2d 647, 740, 101 P.3d 1 (2004). Mothershead fails to establish what Dr. Pleus's opinion ultimately would

have been or what he would testify. Mothershead has therefore failed to meet her prima facie burden of showing prejudice.

Moreover, courts assessing the prejudice prong of "'ineffective assistance claims based on a duty to investigate must . . . [consider the claim] in light of the strength of the government's case.'" *Davis,* 152 Wn.2d at 739 (internal quotation marks omitted) (quoting *Rios v. Rocha*, 299 F.3d 796, 808-09 (9th Cir. 2002)). The State's experts' testimony amply demonstrated that the eye drops were contaminated and that the contamination caused KM's severe injuries. Even if the defense had called Dr. Pleus to testify, the practical effect on the jury of one defense expert, weighed against the testimony of the State's 15 expert witnesses, would likely have been minimal. *Yates*, 180 Wn.2d at 41. Defense counsel's primary strategy at trial tacitly acknowledged this by focusing on raising reasonable doubt as to who had contaminated the eye drops rather than on trying to prove that the eye drops were not contaminated.

We also reject Mothershead's argument that her counsel's failure to continue working with Dr. Pleus prejudiced her by interfering with counsel's preparation for trial. Mothershead's counsel proficiently cross-examined the State's expert witnesses, and in closing arguments effectively recapped salient details of KM's medical history and pointed out some inconsistencies about the medical testimony.

Even if her counsel were deficient in not pursuing Dr. Pleus's opinion as an expert, an issue we do not decide, Mothershead has failed to make a prima facie showing that the alleged deficiency caused prejudice. This claim of ineffective assistance of counsel therefore fails.

2.      Failure to elicit a denial during Mothershead's direct testimony

Mothershead argues that she was denied effective assistance of counsel when, during her testimony, her counsel failed to elicit a direct denial that Mothershead tampered with the eye drops. Had she been asked whether she added anything to the eye drops, Mothershead asserts that her answer would have been "'no.'" Personal Restraint Pet. at 13. Mothershead contends that her counsel's decision not to ask the "ultimate question" prejudiced her because the State "capitalized" on her lack of denial. Pet'r's Suppl. Opening Br. at 43-44. Even if Mothershead's counsel were deficient by not asking a question that elicited a direct denial of guilt, an issue we again do not decide, we conclude that Mothershead has not shown any resulting prejudice.

Mothershead testified that she did not know that the eye drops were contaminated, an answer that was obviously inconsistent with guilt. Mothershead's counsel argued vigorously in her closing argument that Mothershead was not guilty. She reiterated that Mothershead did not know the eye drops were contaminated.  She argued that other people had the motive and opportunity to contaminate the eye drops. The overwhelming majority of the State's closing argument was comprised of arguments based on the evidence the State elicited from the 33 witnesses it called at trial.

The fact that Mothershead did not explicitly deny that she had added anything to the eye drops did not prevent defense counsel from arguing that Mothershead was not guilty, nor did it give the State evidence it did not already have to argue Mothershead's guilt. Mothershead has not shown prejudice because she has not demonstrated that there was a reasonable probability that, but for counsel's failure to ask directly whether she tampered with the eye drops, the outcome of her

trial would have differed. *See Grier*, 171 Wn.2d at 34. This claim of ineffective assistance of counsel also fails.

3.      Preparing the defendant to testify

Mothershead argues that her counsel was ineffective by failing to sufficiently prepare her to testify. Mothershead maintains that counsel never had a meeting "'devoted solely'" to preparing her to testify, counsel made her write her own direct examination questions, and counsel did not explain the process of testifying or prepare her for cross-examination. Personal Restraint Pet., App. A; Pet'r's Reply to State's Resp. at 7. Even if Mothershead's counsel were deficient by failing to prepare her to testify, an issue we do not decide, Mothershead has not shown that she was prejudiced.

Mothershead testified articulately and thoroughly throughout her direct and cross-examinations. Mothershead has not shown prejudice, because she has not established that more preparation would have had any practical effect on the outcome of her trial, especially since she was testifying about recent events from her own life that she should have been able to recall without extensive preparation. *See Yates*, 180 Wn.2d at 41. This ineffective assistance claim also fails.

4.      Failure to object during Dr. Weiss's testimony

Mothershead argues that she received ineffective assistance of counsel because her counsel never objected during Dr. Weiss's testimony. But contrary to this assertion, Mothershead's counsel did object during Dr. Weiss's testimony. Counsel was thus not deficient for failure to object.

To the extent Mothershead argues that her counsel was ineffective by failing to object specifically on the basis that Dr. Weiss's testimony was "based on conjecture, perjury, speculation,

and unreliable content," Personal Restraint Pet. at 15, this claim is based on matters outside the record and Mothershead has not demonstrated that she has competent, admissible evidence supporting the allegations. *In re Pers. Restraint of Yates,* 177 Wn.2d 1, 18, 296 P.3d 872 (2013). This ineffective assistance claim also fails.

     5.       Failure to retain medical doctor

Mothershead argues that her counsel was ineffective by not retaining a medical doctor. For the same reasons Mothershead was not prejudiced by her trial counsel's decision to not continue working with Dr. Pleus, we hold that she has failed to establish any resulting prejudice from the absence of a medical doctor as a defense consultant or witness.

We therefore reject all of Mothershead's claims of ineffective assistance of counsel.

C.     Mothershead's Other Arguments

     1.       State's alleged failure to investigate other suspects

Mothershead argues that the State failed to fully investigate other people who had motive and opportunity to tamper with KM's eye drops including Cody, Courtney, and Matthew. We reject this argument because the State did not improperly fail to investigate other suspects.

The State had a duty to "preserve all potentially material and favorable evidence," but it was not "require[d] . . . to search for exculpatory evidence." *State v. Armstrong,* 188 Wn.2d 333, 345, 394 P.3d 373 (2017). Accordingly, the State had no duty to "search for exculpatory evidence" by investigating the other people Mothershead suggests could have had access to KM and her eye drops. *Id.* Even so, the Pierce County Sheriff's detectives interviewed not just Mothershead, but also Cody, Courtney, and Matthew. We therefore reject this argument.

2.     Trial court's exclusion of other suspect evidence

Mothershead further argues that the trial court abused its discretion by excluding testimony about whether Matthew kept syringes with bleach in them in the room where KM slept. We reject this claim because the trial court did not abuse its discretion by ruling against Mothershead's request to present this other suspect evidence.

"The standard for relevance of other suspect evidence is whether there is evidence 'tending to connect' someone other than the defendant with the crime." *State v. Franklin*, 180 Wn.2d 371, 381, 325 P.3d 159 (2014) (internal quotation marks omitted) (quoting *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932)). This means that "some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." *Id.*

The State filed a motion in limine to exclude other suspect evidence, and the trial court ruled that other suspect evidence would only be admissible if "the defense [showed] a nexus between the other suspect and the crime." VRP (Sept. 9, 2013) at 10. The trial court later sustained the State's objection to evidence about Matthew's syringes on relevancy grounds, citing its pretrial ruling and the defense's own admission that it lacked evidence that "this syringe even existed." VRP (Sept. 23, 2013) at 171. Because Mothershead has not shown nonspeculative evidence with a nexus to the crime, the trial court did not abuse its discretion.

3.     Admissibility of eye drop medications

Mothershead argues that the trial court erred by permitting the State to enter the eye drop medications as evidence and permitting witnesses to testify about them. She asserts that the chain of custody for this evidence was questionable, rendering its admission reversible error. We reject this argument because the defense stipulated that the medications were "properly handled . . . in

accordance with evidentiary procedures, protocols, and requirements" and were admissible. VRP (Oct. 1, 2013) at 21. Thus, this issue was not properly preserved.

In addition, even if the parties had not stipulated to the admissibility of KM's medications, there was no need to establish a chain of custody for this evidence and it was properly admitted. "Evidence that is unique and readily identifiable may be identified by a witness who can state that the item is what it purports to be." *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002). Only where evidence is not readily identifiable is it subject to the "more stringent test" that the evidence's proponent "establish a chain of custody '*with sufficient completeness* to render it *improbable* that the original item . . . [was] exchanged . . . or . . . contaminated or tampered with.'" *Id.* (quoting *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir.1989)).

KM's medications were unique and readily identifiable because they were labeled with identifying information. Accordingly, all that was required was for one of the State's witnesses to identify the evidence. *See Roche,* 114 Wn. App. at 436. This is exactly what happened at trial when the State asked Courtney to identify the medication bottles.

### 4.    Sufficiency of the evidence

Mothershead argues that the evidence presented at trial was insufficient to prove her guilt beyond a reasonable doubt. We reject this argument because Mothershead has not shown that the State's evidence was insufficient for a rational jury to find beyond a reasonable doubt that Mothershead committed the charged offense.[4]

---

[4]To the extent that Mothershead argues there was insufficient evidence that she and not some other suspect committed the crime, those issues were raised and rejected on her direct appeal. *Mothershead,* No. 73634-5-I, slip op. at 32-37; *see also In re Pers. Restraint of Khan*, 184 Wn.2d 679, 693, 363 P.3d 577 (2015). To the extent Mothershead argues there was insufficient evidence of intent, specifically, that argument is addressed below.

To prevail on her sufficiency of the evidence claim, Mothershead needs to clear a high bar. "Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). "Circumstantial and direct evidence are to be considered equally reliable." *Id.* at 266. We will not review the jury's determinations about witness credibility. *Id.*

To the extent Mothershead argues that circumstantial evidence of her guilt was insufficient, this evidence was as reliable as direct evidence and, taken together, was sufficient for a rational jury to convict. The entire trial lasted over two weeks, and the State presented 33 witnesses, including the doctors who treated KM, forensic scientists who analyzed the eye drops she received, and detectives who interviewed Mothershead, as well as Matthew, Courtney, and Cody. The jury needed only to make rational inferences from their testimony to conclude that Mothershead knew the drops were adulterated when she administered them to KM.

Mothershead also argues that the State did not present sufficient evidence for the jury to infer that she intentionally assaulted KM. We reject this claim, because the jury found that Mothershead acted with deliberate cruelty and because this finding was upheld on appeal. The same evidence presented to show deliberateness is also sufficient to establish intent to harm.

5.      Discussion of KM's head injury

Mothershead asserts that the offense for which she was charged did not involve KM's head injury and that the trial court erred under ER 403 by permitting witnesses to discuss this injury at trial. We reject this argument because Mothershead did not preserve it. We will not review arguments based on evidentiary objections unless the objection was preserved at trial. *State v.*

17

*Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). Mothershead never objected at trial to the discussion of KM's head injury.

6.      Dr. Weiss's expert opinion testimony

Mothershead argues that the trial court erred under ER 702 by permitting Dr. Weiss's testimony as an expert and on the grounds that the testimony was not based on medical science. We reject this argument because Mothershead did not preserve this issue. *See id.* Mothershead did not object to Dr. Weiss's credentials, nor did she object on any other grounds.

7.      Disproportionate sentence

Mothershead contends that her 480-month sentence is disproportionate to similarly situated defendants because it was "four times the high end of the standard range" for an offender with an equivalent offender score. Personal Restraint Pet. at 8. She argues that other defendants convicted of first degree assault of a child, including cases in which a jury also found some of the same aggravating factors, received substantially shorter sentences. Mothershead asks this court to remand for resentencing. We reject this claim because Mothershead already raised this argument on direct appeal and Division One rejected it.

A personal restraint petitioner may not raise an issue that was already resolved on direct review unless the petitioner shows that the "interests of justice require reconsideration." *In re Pers. Restraint of Khan*, 184 Wn.2d 679, 693, 363 P.3d 577 (2015). "[R]aised and rejected on direct appeal" means that the ground "presented in the petition was determined adversely to the petitioner on appeal and the prior determination was on the merits." *Davis*, 152 Wn.2d at 671 n.14.

On direct appeal, Mothershead argued that "insufficient evidence supports the jury finding the aggravating factors, and the 480-month sentence imposed by the court is clearly excessive."

*Mothershead*, No. 73634-5-I, slip. op. at 50. Division One disagreed, holding that "the jury's finding on the aggravating factors constituted 'substantial and compelling reasons justifying an exceptional sentence outside the standard range.'" *Id.* at 55.

We conclude that Mothershead has not established that the interests of justice require reviewing her exceptional sentence again. Division One recognized that a trial court abuses its discretion in imposing an exceptional sentence only where the trial court relies on an impermissible reason or unsupported facts, or where the sentence is so long that it shocks the conscience. *Id.* at 54. Here, the trial court explained that Mothershead repeatedly placed a toxic substance in her young daughter's eyes multiple times per day over a period of weeks. We do not revisit Division One's legitimate conclusion that Mothershead's exceptional sentence was not excessive. *See id.* at 55.

8.      Cumulative error

Mothershead finally argues that cumulative error deprived her of her right to a fair trial. She argues the cumulative effect of her counsel's errors collectively caused prejudice sufficient to warrant reversal. Mothershead also points to the cumulative effect of the other errors she raises.

"Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [their] right to a fair trial, even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). The doctrine does not require reversal where "the errors are few and have little or no effect on the trial's outcome." *Id*. The burden is on the petitioner to prove cumulative error.

19

No. 51119-3-II

Mothershead has not established any error that entitles her to relief. Accordingly, we hold that Mothershead's cumulative error claim fails.

CONCLUSION

We deny Mothershead's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Maxa, J.

Sutton, A.C.J.

20