# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the matter of the Personal Restraint of<br><br>DAVID ROQUE-GASPAR,<br><br>                   Petitioner. | No. 56076-3-II<br><br><br><br>UNPUBLISHED OPINION |

GLASGOW, C.J.—AG accused her cousin, David Roque-Gaspar, of raping her multiple times during a two-year period when she was between nine and 11 years old and he was between 15 and 17 years old. After a trial that occurred when Roque-Gaspar was 20 years old, a jury convicted him of four counts of rape of a child in the first degree.

In his personal restraint petition, Roque-Gaspar argues that his trial counsel was constitutionally ineffective, that trying him as an adult when he committed his crimes as a juvenile was a violation of the Eighth Amendment to the United States Constitution, and that the sentencing court failed to properly consider his youth during sentencing.

We hold that Roque-Gaspar received ineffective assistance of counsel because his attorney failed to adequately investigate potential witnesses relevant to a single count. We grant his personal restraint petition in part, reversing his conviction for one count of rape of a child in the first degree relating to the incident on the couch allegedly on the day of AG's baptism. We remand this matter

to the trial court for a new trial on that count. As a result, we do not reach the sentencing issues as the trial court must also resentence Roque-Gaspar. We otherwise deny the petition.

FACTS

I. BACKGROUND

As a child, AG moved with her mother, father, and four siblings to live with her paternal aunt, Graciela Roque-Gaspar, in Tacoma. Graciela and her husband lived in a house with their four children, including Roque-Gaspar. The house was full and frequently noisy, and many members of the household shared rooms.

AG testified that when she lived in Graciela's house, Roque-Gaspar raped her approximately twice per week for two years. Roque-Gaspar first raped AG when he was 14 or 15 years old and she was nine years old. She was alone in the bedroom she shared with other members of her family when Roque-Gaspar came in and asked if she wanted to have sex. AG said no because she did not know what sex was. Roque-Gaspar then left the room and came back wearing shorts. He grabbed AG, pulled down her pants and underwear, and vaginally raped her. AG tried to yell, but Roque-Gaspar silenced her by putting his hand over her mouth.

Roque-Gaspar raped AG again while she was watching her infant sister in her mother's room. Roque-Gaspar put AG's sister down and grabbed AG. He pulled AG's pants and underwear down, vaginally raped her, and put his hand on her mouth when she tried to make noise.

In a third incident, Roque-Gaspar found AG alone watching television after the rest of the family had gone to bed. He raped her on the couch. AG testified this incident happened on the night of her church baptism.

AG reported that Roque-Gaspar raped her many more times, about two times per week during a two-year period.

After AG turned 11, she moved to Arizona with her mother, Chantelle Gaspar. When she was 13, AG returned to Graciela's house to live with Francisco Gaspar, her father. Francisco was strict and sometimes got angry with AG for talking to boys.

At 14, AG told some of her relatives that Roque-Gaspar had raped her. AG's mother then learned of the rapes and moved AG back to Arizona the next day.

Sometime after AG moved back to Arizona, she went to a clinic for the purpose of getting birth control. AG and her mother had a conflict about AG's choice of birth control method, leading the nurse practitioner to refer both of them to counseling. After AG disclosed her history of sexual abuse, a registered nurse made a mandatory report to the local police department and advised AG's mother to make a report to the Tacoma Police Department. AG's mother contacted the Tacoma Police Department and an officer took her report.

## I. INVESTIGATION

Tacoma Police Detective Patricia Song called Roque-Gaspar to tell him that his name had come up in an investigation and that she would like to meet with him. Roque-Gaspar met with Song and Detective Phillip Hoschouer in an interview room at Tacoma Police headquarters.

Song asked Roque-Gaspar if anything sexual had happened between him and AG. Roque-Gaspar said no, he was religious and waiting until marriage to have sex. Song told him that, according to AG, he had vaginally raped her on the night of her baptism. Roque-Gaspar denied the allegation. In response, Song began asking if AG had ever initiated any kind of sexual contact. She said, "So I've got one extreme and then the other extreme. And I think the truth is somewhere

3

kinda in the middle." Personal Restraint Pet. (PRP), App. at 79. Hoschouer added, "I'm not accusing you of rape. You know, what I'm saying is . . . don't minimize about what actually happened . . . because then I have to take a look at it like, well, maybe it was forcible rape?" *Id.* at 82. After a pause, Roque-Gaspar replied:

> I'm -- I'm gonna state what I didn't -- you know, I didn't, you know, rape her? You know, it wasn't forceful. But there could have been an instance where I kinda like grabbed her in her, you know, her private area, you could say? But she did not make a remark, you know, saying she was uncomfortable or she didn't want, you know, anything to do with that and she didn't say anything after that.

*Id.* at 83. Hoschouer responded that he and Song were trying to give Roque-Gaspar the opportunity to talk about the intercourse that took place. Roque-Gaspar said, "[T]here was no intercourse from what I remember, at all." *Id.* at 84. Song said that Roque-Gaspar was cementing AG's story by denying her allegations.

Eventually, Roque-Gaspar said there was a time when he and AG kissed and he put his hand under her underwear. The detectives left the room, and when Hoschouer returned, he encouraged Roque-Gaspar to give him more information about what took place with AG because Song was done listening to him. When Song returned, she said that it was time to be honest and talk "about the intercourse that happened, the consensual [intercourse]." *Id.* at 96. She described other instances of rape AG had reported and said, "What I'm trying to tell you, is that I think you guys had consensual sex." *Id.* at 100. Roque-Gaspar repeated that he did not remember intercourse taking place.

After additional statements of disbelief from Song, Roque-Gaspar said that after he grabbed AG's private area, he got on top of her, undid her pants, pulled down his own pants and underwear, and put his penis between her legs. He said that at that point, he felt that AG was scared, so she

put her hand in the way and closed her legs. In response, Song said, "See, if you had consensual sex with AG, I need to know about it. Otherwise, what lies ahead for you is a world of hurt." *Id.* at 106. Roque-Gaspar replied that he did not have sex with her, and Song expressed additional skepticism:

> Q: So you never had sex with AG.
> A: No.
> Q: And we're sticking to that.
> A: (NODS HEAD AFFIRMATIVELY)

*Id.*

The interview ended with Song expressing her belief that Roque-Gaspar had still not told the truth. The detectives gave Roque-Gaspar their cards in case he wanted to talk again.

The State charged Roque-Gaspar with four counts of rape of a child in the first degree.

### III. TRIAL

A.     Opening Statements

In its opening statement, the State said AG would testify to four specific instances when Roque-Gaspar raped her: the first rape, which took place in her bedroom; a rape that took place after AG's baptism, which happened in her bedroom while she was wearing a white dress; a rape that took place on the living room couch after a family get-together; and a rape that took place in AG's mother's bedroom while AG's baby sister was present.

The defense's opening statement presented AG as an adolescent who made false allegations about Roque-Gaspar to escape her father's strict supervision. Defense counsel said that Roque-Gaspar, who was "naive," falsely confessed to having sexual contact with AG due to psychological pressure from detectives. Verbatim Rep. of Proc. (VRP) (Feb. 1, 2018) at 449.

5

B.      State Witnesses

Song testified. The State asked her what kind of training she had received on interviewing suspects. She said she had "been to a few interviewing schools," including Reid Interrogations. *Id.* at 512. The State then asked her how she would characterize her own interviewing style. Song said she is "typically pretty low key, kind of straightforward," and that she will challenge a statement if she feels the need to do so. *Id.* at 513. Finally, the State elicited testimony about the interview of Roque-Gaspar and successfully moved to admit a video recording of the interview into evidence. When defense counsel cross-examined Song, she confirmed that while interrogating Roque-Gaspar, she told him that he was strengthening AG's case of forcible rape by not telling her that he had intercourse with AG.

AG testified, describing three specific instances in which Roque-Gaspar raped her: while she was in her bedroom, while she was watching her baby sister in her mother's bedroom, and while she was watching television on the couch. Regarding the third incident, AG testified that it occurred after her baptism:

> Q: What had happened that day leading up to that moment?
> A: I got baptized.
> Q: What's that?
> A: I had got baptized.
> Q: So that was the day that you got baptized?
> A: Yes.

VRP (Feb. 5, 2018) at 642. AG said that after her baptism and baptism party, she went home and decided to watch television while the rest of the family went to bed. She said that when she was sitting on the couch, Roque-Gaspar came downstairs and raped her. She said she did not remember what she was wearing at that time.

In addition to describing those instances, AG testified that Roque-Gaspar raped her about twice a week from when she was nine years old until she was 11 years old. She said that in every instance of rape, Roque-Gaspar forced her to have vaginal intercourse and covered her mouth with his hand.

Next, AG explained how the investigation into her case began. She said that while living in Arizona, she disclosed her history of sexual abuse at a clinic. She said that after the appointment, a nurse told the police about what Roque-Gaspar had done.

In his cross-examination of AG, defense counsel asked her about the rape that took place in her baby sister's presence. He noted that AG was not sure how old her sister was at the time and asked, "[Y]our sister didn't cry or anything like that; isn't that right?" *Id.* at 728. Defense counsel also asked her about the rape that took place after her baptism, noting that she had said in a forensic interview that Roque-Gaspar had raped her in her bedroom rather than in the living room.

AG's mother testified after AG. The State elicited testimony about her role in AG's moves between Washington and Arizona. The State asked her why she decided to move AG back to Arizona the last time, and she said, "Because I was told that she was molested." VRP (Feb. 6, 2018) at 807. The State also elicited testimony about AG's baptism, and AG's mother stated that AG wore regular clothing and that after the baptism party, the entire family went home.

C.    Defense Witnesses

The defense's first witness was Francisco, AG's father. During his testimony, defense counsel had an interpreter on standby in case Francisco needed assistance. Francisco testified that on the night of her baptism, AG stayed with her godparents, Goel and Ana. Counsel asked for their last names, and Francisco said, "I don't remember at the moment." VRP (Feb. 8, 2018) at 984.

7

Francisco also testified that he canceled AG's quinceañera because he saw her kissing a boy, contradicting AG's version of why the quinceañera was cancelled. When defense counsel asked Francisco why he did not report Roque-Gaspar to the police after finding out that AG had accused him of rape, he said, "I did not believe her." VRP (Feb. 12, 2018) at 1078.

After Francisco had begun testifying, defense counsel asked the trial court for permission to bring in another witness, stating that he had been informed "that the godparents or one of the godparents would be willing to testify." *Id.* at 1065. Counsel said the godparent would testify that AG stayed with them on the night after her baptism. The trial court asked, "[T]his information could have been available to you prior to now; correct?" *Id.* at 1067. Counsel replied, "Arguably, yes." *Id.* The trial court denied counsel's request, stating that it was "too late in the game." *Id.* at 1068.

Rosa, AG's paternal aunt, testified next. Like Francisco, she testified that AG left her baptism with her godparents, adding that AG was wearing a white dress that day. Additionally, like Francisco's testimony, her testimony cast doubt on AG's credibility: she said that she observed no unusual behavior in AG between the ages of nine and 11, that AG brought up her allegations right after Rosa caught her with a neighborhood boy, and that AG "had a smirk on her face" and "was moving too much" when she first "started saying her accusations." *Id.* at 1094.

At one point during the State's cross-examination of Rosa, she asked the prosecutor to restate his question using different words, adding that she was told that there would be an interpreter but she did not see one. The prosecutor asked if she needed an interpreter, and she said, "No. I can try doing it like now, but just another -- I mean, please." *Id.* at 1098. After a recess and before the jury returned, the prosecutor said, "I was given the impression counsel was requesting

8

a Spanish interpreter." *Id.* at 1134. Defense counsel replied that both he and Rosa had spoken with an interpreter and that Rosa ultimately decided to testify in English.

The defense's next witness was Graciela, AG's paternal aunt and Roque-Gaspar's mother. Regarding AG's baptism, she testified that AG left with her godparents while everyone else in the family went home. Regarding AG's return to her house at the age of 13, Graciela said she seemed happy, normal, and unafraid. Graciela also testified that in the summers of 2010 and 2011, Roque-Gaspar was in Portland, Oregon with "one of [her] friends," helping the friend clean coins. *Id.* at 1143.

Finally, Roque-Gaspar took the stand. He testified that he falsely confessed to sexual contact with AG because he was afraid that the police would detain him if he did not give them some sort of confession. He denied ever raping AG.

During cross-examination, the State asked Roque-Gaspar about his summers in Portland, and he said he returned home anywhere from two to four days a month. When the State questioned him about his interview with the detectives, the prosecutor misquoted him:

> Q: And similarly, later, you indicated, "You know, I didn't -- I'm going to stick with I didn't rape her," right?
>
> A: Right.

VRP (Feb. 13, 2018) at 1275. Defense counsel did not object to the misquote.

D.      Closing Arguments

The State's closing argument repeated the three specific instances of rape AG brought up in her testimony: the instance in her bedroom, the instance on the couch after her baptism, and the instance in her mother's bedroom in which her baby sister was present. The State also emphasized that Roque-Gaspar had raped AG many more times: "[AG] told you how this didn't just happen

these three times, but up to twice a week, and much more than four times." *Id.* at 1319. In addressing the fact that Roque-Gaspar denied raping AG, the State again misquoted him as having told the detectives, "I'm going to stick with I didn't rape her." *Id.* at 1345. Defense counsel did not object to the misquote.

However, defense counsel objected at other points during the State's closing. To cast doubt on Rosa's credibility, for example, the State mentioned that Rosa had been a mandated reporter but had not taken AG's allegations to the police. Defense counsel objected on the basis of relevancy.

In his closing argument, defense counsel said that the facts as presented defied common sense, pointing out that the house where AG and Roque-Gaspar lived "was a very very crowded environment in which there was hardly any privacy." *Id.* at 1352. He presented AG as an adolescent who falsely accused Roque-Gaspar of rape because her strict father had canceled her quinceañera and she wanted to return to her mother in Arizona. To further counter AG's testimony, he highlighted the conflicting testimony over where AG stayed the night after her baptism.

E.      Verdict and Appeal

The trial court instructed the jury that to convict Roque-Gaspar "on any count of Rape of a Child in the First Degree," it must "unanimously agree as to" which particular act of rape of a child in the first degree the State proved beyond a reasonable doubt. Clerk's Papers (CP) at 65. When the jury deliberated, it asked for the location of each count of rape. The trial court's response was, "Please reread your jury instructions and continue to deliberate." VRP (Feb. 14, 2018) at 1375.

After a recess, the jury delivered its verdict. It found Roque-Gaspar guilty of four counts of rape of a child in the first degree.

This court affirmed on direct appeal, and the appeal was mandated on August 21, 2020. Mandate, *State v. Gaspar*, No. 51699-3-II, at 1 (Aug. 21, 2020). Roque-Gaspar filed a timely personal restraint petition with this court on August 20, 2021.

## ANALYSIS

### I. PERSONAL RESTRAINT PETITION STANDARD

A person convicted of a crime may request relief through a personal restraint petition when they are under an unlawful restraint. *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). To obtain relief, the "petitioner must prove either a . . . constitutional error that results in actual and substantial prejudice or . . . nonconstitutional error that 'constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 672, 101 P.3d 1 (2004)). "[T]he petitioner must prove the error by a preponderance of the evidence." *Id.* If "a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

To establish grounds for relief, a personal restraint petition should set forth a statement of "the facts upon which the claim of unlawful restraint of petitioner is based and the evidence available to support the factual allegations." RAP 16.7(a)(2)(i). "The petitioner . . . may not rely solely on conclusory allegations." *Monschke*, 160 Wn. App. at 488.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Roque-Gaspar contends that his trial counsel made crucial errors in investigating, preparing witnesses for trial, objecting, cross-examining witnesses, finding expert witnesses, and arranging for interpretation services. Additionally, he argues that we should presume that he was prejudiced by counsel's deficient performance because counsel failed to subject the State's case to meaningful adversarial testing.

Both the federal and state constitutions guarantee the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017); U.S. CONST. amend. VI; CONST. art. I, § 22. To establish ineffective assistance of counsel, the defendant must establish "'that counsel's performance was deficient' and that 'the deficient performance prejudiced the *defense*.'" *State v. Carson*, 184 Wn.2d 207, 216, 357 P.3d 1064 (2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Failure to meet either requirement requires us to reject the claim. *Estes*, 188 Wn.2d at 457-58.

Counsel's performance "is deficient if it falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *Id.* at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). To demonstrate that counsel performed deficiently, the defendant must show that there were no "'legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (quoting *McFarland*, 127 Wn.2d at 336). There is "a strong presumption that counsel's representation was reasonable." *Estes*, 188 Wn.2d at 458.

Counsel's deficient performance prejudices the defense where "there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would

have been different.'" *Id.* (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

Prejudice is presumed "in certain limited cases." *Davis*, 152 Wn.2d at 673. The presumption of prejudice applies where a defendant experiences the complete denial of counsel or comparable circumstances, such as where a defendant lacks counsel at a critical stage of their trial; where "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;'" where the circumstances make the likelihood of any lawyer providing effective assistance so small that a presumption of prejudice without inquiry into the trial is appropriate; or "'where counsel labors under an actual conflict of interest.'" *Id.* at 674 (quoting *Visciotti v. Woodford*, 288 F.3d 1097, 1106 (9th Cir. 2002)).

Contrary to Roque-Gaspar's argument, the presumption of prejudice does not apply here. Counsel subjected the State's case to meaningful adversarial testing: he developed a coherent theory of the case, cross-examined AG about inconsistencies in her story, and elicited testimony from adults in AG's family—including her father—who did not believe Roque-Gaspar raped her. There is no indication in the record that Roque-Gaspar lacked counsel at any point during the trial, that circumstances made counsel unable to represent Roque-Gaspar effectively, or that counsel labored under an actual conflict of interest. Accordingly, we individually analyze the specific instances of ineffective assistance Roque-Gaspar alleges.

A.    Investigation and Identification of Witnesses

Roque-Gaspar argues that insufficient pretrial investigation left counsel ignorant of several important witnesses. Specifically, he argues that counsel should have located and secured testimony from AG's godparents; the person Roque-Gaspar worked for during two summers; a

13

friend of the family; and a Tacoma Public Schools employee who met with several members of the Gaspar family during the relevant time period.

### 1. Deficient performance

Counsel must make reasonable investigations or make reasonable decisions "that particular investigations are unnecessary." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 889, 828 P.2d 1086 (1992). "The duty to investigate 'does not necessarily require that every conceivable witness be interviewed.'" *Davis*, 152 Wn.2d at 739 (quoting *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended by* 253 F.3d 1150 (9th Cir. 2001)). "Once counsel reasonably selects a defense . . . 'it is not deficient performance to fail to pursue alternative defenses.'" *Id.* at 722 (quoting *Rios v. Rocha*, 299 F.3d 796, 807 (9th Cir. 2002)). A defendant alleging failure to investigate "must show a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." *Id.* at 739.

Here, counsel found witnesses that meaningfully supported the defense's theory of the case. For example, Francisco, AG's father, said he did not believe AG's allegations against Roque-Gaspar. Rosa, AG's aunt, said AG smirked when she first told her that Roque-Gaspar had raped her. Graciela, AG's aunt and Roque-Gaspar's mother, said that when AG moved back to Washington, she seemed like a normal, happy kid who was not nervous about living with Roque-Gaspar again.

Roque-Gaspar contends that counsel should have brought in additional witnesses. But there is no evidence in the record showing what defense counsel learned about these witnesses and their potential testimony. Moreover, for the most part, they would have been unhelpful or they had limited information. Roque-Gaspar's employer would have testified about Roque-Gaspar working

for him in Oregon in the summers of 2012 and 2013, but this would not have helped Roque-Gaspar's case because AG moved to Arizona in March 2012, and Roque-Gaspar testified to returning home several times per month while he was in Oregon. The family friend would have testified that she "never saw anything aside from normal sibling interactions between [Roque-Gaspar] . . . and any cousins" during annual vacations, but counsel reasonably chose witnesses who could offer more in-depth testimony about the family's dynamics. PRP, App. At 114. The former Tacoma Public Schools employee would have served as a character witness, as she would have testified that Roque-Gaspar was well-behaved while AG acted out. Her allegations about AG's mother abusing her children would have been irrelevant to the question of whether Roque-Gaspar raped AG.

However, we conclude that counsel performed deficiently when he failed to identify AG's godparents as potential witnesses before trial. AG testified that Roque-Gaspar raped her in their home after her baptism. Counsel could have discredited her statements by bringing in her godparents and having them testify that AG slept at their house that night.

Because the godparents could have placed AG in a different location from Roque-Gaspar on the night she alleged one of the rapes occurred, they were witnesses who, if believed, could have established the impossibility of AG's claims about that night. Their testimony would have been particularly useful because there was conflicting testimony from family members about where AG went after her baptism.

The record shows that counsel failed to locate the godparents before the trial was underway. After Francisco testified that AG stayed with her godparents on the night after her baptism, counsel asked the trial court for permission to bring in an additional witness, stating that he had been

informed "that the godparents or one of the godparents would be willing to testify." VRP (Feb. 12, 2018) at 1065. The trial court asked, "So, Mr. Greene, this information could have been available to you prior to now; correct?" *Id.* at 1067. Counsel replied, "Arguably, yes." *Id.* The trial court denied counsel's request, stating that it was "too late in the game." *Id.* at 1068. Given that the godparents could have been key defense witnesses, it was deficient for counsel not to locate them before trial.

### 2. Prejudice

When counsel failed to locate AG's godparents before Roque-Gaspar's trial, his deficient performance prejudiced the defense with regard to the one count of rape that AG said occurred on the couch after her baptism. *See* VRP (Feb. 13, 2018) at 1318-19. We conclude that Roque-Gaspar thus received ineffective assistance of counsel in this regard.

AG testified unequivocally that Roque-Gaspar raped her on the night of her baptism. However, Francisco, Rosa, and Graciela all testified that AG spent the night at her godparents' house after she was baptized. Additionally, during deliberation, the jury asked for the location of each count, suggesting confusion around whether it had enough evidence to convict Roque-Gaspar of all four counts of rape.

The record is sufficient to establish that the godparents would have testified that AG spent the night with them after her baptism. Had AG's godparents testified, they would have supported Roque-Gaspar's defense because they would have said AG was in a different location from Roque-Gaspar at a time when AG claimed he raped her. Due to the other testimony contradicting AG's account of the events following her baptism, there is a sufficient probability that if the jury had

heard the godparents' testimony, it would have found Roque-Gaspar not guilty of that count, undermining our confidence in the outcome.

We conclude that counsel's ineffective assistance requires reversal of the conviction relating to the incident on the couch after AG's baptism. Roque-Gaspar is entitled to a new trial on one count of rape of a child in the first degree.

B.      Preparation of Witnesses for Trial

Roque-Gaspar argues that counsel failed to properly prepare Francisco and Graciela for trial.[1] He points out that Francisco "was unable, when questioned, to recall the last name or phone number of [AG]'s godparents." Opening Br. of Pet'r at 13. He also points out that Graciela "was prepared to testify that [ Roque-Gaspar] had spent two summers out of state working for a family friend but was not prepared with this person's name or any contact information." *Id.* at 14. Roque-Gaspar contends that in both instances, "what could have been powerful testimony casting grave doubts on [AG]'s claims were rendered virtually impotent." *Id.*

Failure to adequately prepare a witness for trial constitutes deficient performance. *See Monschke*, 160 Wn. App. at 492. However, "there is no absolute requirement that defense counsel interview witnesses before trial." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 488, 965 P.2d 593 (1998). For example, in *Pirtle*, the court found no deficient performance where counsel did not formally interview investigating police officers but "spent considerable time reviewing evidence and obtaining answers to various questions with" the lead detective and his assistant. *Id.*

Additionally, a witness's conduct on the stand does not necessarily show deficient performance. *See Monschke*, 160 Wn. App. at 494. For example, in *Monschke*, the petitioner

---

[1] While the petition used Rosa's name, it referenced Graciela's testimony.

argued that counsel performed deficiently because a defense witness volunteered damaging information without being prompted. *Id.* at 493. We held that counsel's performance was not deficient because the witness testified consistently with what he told counsel in pretrial preparations and the defendant pointed "to nothing that would have" changed the witness's conduct, "even if his counsel had done a mock trial or practiced [the witness's] testimony." *Id.* at 494.

Here, we decline to find deficient performance in preparing witnesses for trial. The record shows that counsel spoke with witnesses before the trial took place. Moreover, he elicited coherent narratives from each witness that supported his theory of the case. While Francisco forgot AG's godparents' last names and Graciela forgot the name of Roque-Gaspar's employer, these incidents do not show that counsel performed deficiently. No amount of interviewing or practice guarantees that witnesses will perform perfectly under the pressures of trial and forgetting specific details is understandable.

C.      Misquote of Defendant

Roque-Gaspar argues that counsel allowed the State to repeatedly misquote Roque-Gaspar as having said, "I'm gonna stick with I didn't rape her." Opening Br. of Pet'r at 9. He contends that the "quote as fabricated by the State implies guilt" and that there "was no legitimate trial strategy that could be attributed to defense counsel allowing the State to repeatedly misquote his client." *Id.* at 9-10.

When and how an attorney objects is a "classic example of trial tactics." *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "A few or even several failures to object are not usually

cause for finding" deficient performance. *Id.* at 250. For example, it is a legitimate trial tactic for an attorney to forgo objecting when they wish to avoid highlighting certain evidence. *Id.* at 248.

Here, counsel objected frequently and at critical moments during witness examinations and during closing. *E.g.*, VRP (Feb. 6, 2018) at 808 (successfully objecting to hearsay during AG's mother's testimony); VRP (Feb. 13, 2018) at 1321 (objecting during closing to an argument about the possible motives of a witness helpful to the defense). Overall, counsel's decisions regarding objections do not show a lack of tactical thinking. Moreover, the jury saw a video of the interview, so they could evaluate for themselves what Roque-Gaspar said. We therefore defer to counsel's decision not to object when the State misquoted Roque-Gaspar, especially because he may have wanted to avoid calling more attention to this exchange in the police interrogation.

D.      Cross-Examination of the State's Witnesses

Roque-Gaspar argues that there "was no possible strategy for counsel's decision not to highlight all of the inconsistences and potential false statements in [AG]'s testimony." Opening Br. of Pet'r at 16. Additionally, Roque-Gaspar argues that counsel's cross-examination of Song was deficient because he "failed to ask any questions regarding the Reid Technique and its scientific basis—or lack thereof—in interrogation." *Id.* at 15-16.

Like other matters of trial strategy, courts generally entrust cross-examination techniques to attorneys' professional discretion. *Davis*, 152 Wn.2d at 720. In assessing a claim that an attorney failed to effectively cross-examine a witness, it is not necessary to determine why the attorney made their decision if their "approach falls within the range of reasonable representation." *Id.*

Here, counsel did not cross-examine AG or Song deficiently. When cross-examining AG, counsel seemed to focus on the discrepancies most directly related to AG's specific allegations of

rape. He cross-examined her about the rape that took place after her baptism, pointing out that she had previously said that Roque-Gaspar raped her in her bedroom rather than in the living room. He also cross-examined her about the rape that took place in her sister's presence, pointing out that AG was not sure about how old her sister was at the time and expressing skepticism about the fact that her sister, who was a baby, never cried. Ultimately, AG was a minor testifying about being repeatedly raped by her cousin when she was nine, 10, and 11 years old. Balancing the need to cause doubt about her testimony with the need to avoid alienating jurors was squarely in the realm of strategic decision-making.

Similarly, counsel's cross-examination of Song fell within the range of reasonable representation. Song said that she used a mix of interviewing techniques when she interrogated Roque-Gaspar. It was therefore sensible for counsel to focus less on the formal techniques she used and more on the specific actions she took while interrogating Roque-Gaspar, such as telling Roque-Gaspar that he was strengthening AG's case by not admitting to having vaginal intercourse with her. Counsel did not perform deficiently when cross-examining either witness.

E.      Expert Witnesses

Roque-Gaspar argues that "counsel failed to hire even one expert witness to testify in a case where one expert, if not two, may have made the difference between a one-word and two-word verdict." Opening Br. of Pet'r at 19. Specifically, he contends that an expert witness would have explained how officers' use of the Reid Technique led Roque-Gaspar to falsely confess. He also contends that an expert on adolescent brain development "would . . . have been able to testify as to the perceptions of the average [15-year-old], whether that boy would necessarily have understood the full implications of his actions." *Id.* at 21. Finally, Roque-Gaspar contends that

20

during sentencing, such an expert could have shown "how opportunism and lack of impulse control was more a factor in the allegations leveled by [AG] than any pre-planning." *Id.*

"Generally, an attorney's decision to call a witness to testify is 'a matter of legitimate trial tactics.'" *Monschke*, 160 Wn. App. at 492 (quoting *State v. Byrd*, 30 Wn. App. 794, 799, 638 P.2d 601 (1981)). Many cases present ample opportunities to hire "any number of hypothetical experts—specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines—whose insight might possibly [be] useful." *Harrington v. Richter*, 562 U.S. 86, 107, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). An attorney is entitled "to balance limited resources in accord with effective trial tactics and strategies." *Id.*

Counsel did not perform deficiently when he chose not to hire an expert on false confessions for trial. He selected a reasonable strategy that did not depend on such testimony: presenting AG as a rebellious adolescent who made up rape allegations to escape her father's watchful eye, presenting Roque-Gaspar as a naive young person who falsely confessed to appease police officers, and focusing on the improbability of AG enduring repeated rapes in a house full of people without anyone finding out. Expert testimony on false confessions could have clouded this narrative instead of bolstering it, and it could have invited the jury to focus on the statements Roque-Gaspar made during the interrogation. Additionally, the jury had the opportunity to watch a recording of the detectives interrogating Roque-Gaspar and evaluate the detectives' tactics for themselves in light of the argument that Roque-Gaspar made a false confession under pressure. It was not deficient for counsel to decide that an expert was unnecessary.

We note that with his reply, Roque-Gaspar submitted the declaration of an expert who attached several articles about juveniles and their propensity to falsely confess in interrogations.

21

But the expert does not specifically analyze the interrogation at issue here, and Roque-Gaspar was not a juvenile when he was interrogated. This late submission does not establish deficiency or prejudice.

Likewise, Roque-Gaspar has not established that counsel performed deficiently by failing to hire an expert on adolescent brain development to testify at trial. A person does not need to understand the full implications of their actions to commit rape of a child in the first degree. *See* former RCW 9A.44.073(1) (1988) ("A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim."). Thus, expert testimony on the average 15-year-old boy's understanding of his actions would have been irrelevant to the issues at trial.

Because we remand this matter for resentencing, we need not reach Roque-Gaspar's argument that counsel should have hired an expert witness for sentencing.

F.     Victim Testimony About Birth Control

Roque-Gaspar argues that counsel should have questioned the nurse about a conflict between AG and her mother regarding AG's chosen method of birth control. He contends that this evidence "would have provided the jury with a more accurate picture of [AG]." Opening Br. of Pet'r at 18.

In any rape prosecution, "evidence of the victim's past sexual behavior . . . is not admissible if offered to attack the credibility of the victim and is admissible on the issue of consent" only pursuant to a specific procedure. RCW 9A.44.020(3). However, such evidence may be admissible

where a defendant offers it for a purpose other than attacking the survivor's "credibility by showing a propensity for sexual conduct." *State v. Horton*, 116 Wn. App. 909, 920, 68 P.3d 1145 (2003).

The trial court allowed testimony about the fact that there was conflict between AG and her mother, but the court was not inclined to allow testimony about the specific source of conflict. In his briefing to this court, Roque-Gaspar does not identify any particular relevance of the fact that the conflict was about birth control, nor does he convincingly explain why that detail would have been helpful to his theory of the case and admissible.

And even if counsel's failure to revisit the discussion of birth control constituted deficient performance, it did not prejudice the defense. Had counsel elicited testimony about AG's request for birth control and the resulting conflict with her mother, it is unlikely that the outcome of the trial would have been different. Roque-Gaspar makes that concession, noting that while "*this alone may not have changed the course of the trial*, it would have provided the jury with a more accurate picture of [AG] . . . as a child who was argumentative and determined to get her way in all things." Opening Br. of Pet'r. at 18 (emphasis added). There was already testimony about the fact that AG had rebellious tendencies, and this one detail about a conflict with a parent is unlikely to have made a difference in how the jury saw her.

G.      Interpreter for a Witness

Roque-Gaspar argues that counsel should have arranged interpretation services for Rosa, a defense witness and Roque-Gaspar's aunt.[2]

If a witness's English skills are such that they require an interpreter, counsel is deficient for failing to obtain one. *See In re Pers. Restraint of Khan*, 184 Wn.2d 679, 690, 363 P.3d 577

---

[2] While the petition used Graciela's name, it referenced Rosa's testimony.

(2015). Here, however, counsel did not perform deficiently because Rosa declined to use the services of an interpreter who was available. When the State said it "was given the impression counsel was requesting a Spanish interpreter," counsel replied that both he and Rosa spoke with an interpreter and that Rosa ultimately decided to testify in English. VRP (Feb. 12, 2018) at 1134. Thus, counsel did not perform deficiently in this regard.

### III. EXCESSIVE SANCTIONS

Roque-Gaspar argues that the "requirement that anyone over 18 must be tried as an adult, regardless of the age at which the crimes were committed, is a plain violation of Eighth Amendment jurisprudence and must be found unconstitutional." Opening Br. of Pet'r at 36.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. CONST. amend. VIII. It gives "individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). Where a defendant allegedly committed crimes as a minor, adjudicating their case outside juvenile court "does not implicate the Eighth Amendment's prohibition on cruel and unusual punishment because adult courts have discretion to depart from standard sentence ranges to avoid excessive punishment of juveniles." *State v. Watkins*, 191 Wn.2d 530, 536-37, 423 P.3d 830 (2018).

While Roque-Gaspar's sentence punished him for his conduct as a minor, the fact that his case was adjudicated outside juvenile court does not implicate the Eight Amendment's prohibition on cruel and unusual punishment. Roque-Gaspar argues that the law should change. However, we "are bound to follow majority opinions of our Supreme Court." *In re Pers. Restraint of Le*, 122 Wn. App. 816, 820, 95 P.3d 1254 (2004).

No. 56076-3-II

CONCLUSION

We grant in part Roque-Gaspar's personal restraint petition as to one count of rape of a child in the first degree. We reverse the first degree rape of a child conviction relating to the incident on the couch allegedly after AG's baptism, and we remand to the trial court for a new trial on that count and resentencing. Because Roque-Gaspar requires resentencing, we do not reach the issues relating to sentencing. We otherwise deny the petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Maxa, J.

Lee, J.

25